HUMANA OF KENTUCKY, INC., d/b/a Humana Hospital Lake Cumberland, Appellant,

v.

Brian McKEE, an Infant, by and through his next friend, Leroy McKee; and Leroy McKee, Individually, Appellees.

Brian McKEE, an Infant, by and through his next friend, Leroy McKee; Leroy McKee, Individually; and Della McKee, Individually, Appellants,

v.

HUMANA OF KENTUCKY, INC., d/b/a Humana Hospital Lake Cumberland Appellee.

Nos. 91–CA–1194–MR, 91–CA–1247–MR.

Court of Appeals of Kentucky.

Aug. 7, 1992.

Frank P. Doheny, Jr., B. Todd Thompson, Sara L. Abner, Louisville, for Humana of Kentucky, Inc., d/b/a Humana Hosp. Lake Cumberland.

Ann B. Oldfather, Louisville, for Brian McKee, an infant, by and through his next friend, Leroy McKee; and Leroy McKee, Individually; and Della McKee, Individually.

Before DYCHE, GUDGEL and HAYES, JJ.

GUDGEL, Judge:

These appeals stem from a judgment entered by the Pulaski Circuit Court in a negligence action against a hospital. After a trial, a jury determined that negligence on the part of appellant/appellee Humana of Kentucky, Inc., d/b/a Humana Hospital Lake Cumberland (Humana), was a substantial factor in the failure to diagnose an infant, appellee/appellant Brian McKee (Brian), as suffering from the congenital metabolic disorder of phenylketonuria (PKU). The jury awarded damages to Brian in the amount of $5,500,000. His father, appellee/appellant Leroy McKee, was awarded a separate judgment reimbursing him for medical expenses incurred on Brian's behalf in the amount of $4,271.68. In all, the parties have raised a total of eighteen issues in their respective briefs. For the reasons stated below, we find no merit in any of their contentions. Hence, we affirm.

## I.
### Summary of Facts

Because we must determine whether the trial court erred by failing to grant Humana's motion for a directed verdict, an unusually detailed recitation of the relevant facts is necessary before we address the numerous issues raised on appeal.

Brian was born on May 1, 1977, at Humana Hospital. On that date KRS 214.155 required hospitals to cause the performance of a PKU test on each newborn infant no sooner than 24 hours after birth. The test requires blood to be drawn from the infant's heel and to be placed directly on filter paper which is part of a form provided by and returned to the state laboratory

in Frankfort. The blood specimen is analyzed and the results then are returned to the hospital. The blood of an infant who suffers from PKU will show an elevated level of phenylalanine, which is an amino acid formed from protein. As PKU is a metabolic disorder which causes the body to be unable to process phenylalanine, the ingestion of protein causes abnormal levels of phenylalanine to accumulate in the affected child's body and to damage the developing central nervous system, especially the brain, resulting in mental retardation and a likelihood of major seizures. Untreated PKU children are totally dependent as adults and require lifelong medical care from families or institutions. The harmful accumulation of phenylalanine, however, can easily be prevented if the diagnosis of PKU is made at or near birth, as the treatment is a simple case of restricting a child's dietary intake of proteins. With timely treatment, a PKU child can be expected to lead a normal, healthy and productive life.

Brian's hospital record indicates that on May 19, 1977, when he was eighteen days old, hospital personnel noted in his record that the state laboratory reported that Brian's PKU test result was negative. Although developmental problems were subsequently noted during Brian's infancy and early childhood, Brian's parents and doctors assumed that he was progressing slowly or that he was suffering from some vague psychological difficulties. Upon his entering first grade, however, it became apparent that Brian had suffered significant developmental delays. He then was referred to the University of Kentucky Child Evaluation Center, and in 1983 he was diagnosed as having classic PKU.

The evidence established that, barring "biologic variation," a PKU test of Brian's blood soon after birth should have been positive. There was no entry in Brian's hospital record by either a nurse or a lab technician, however, to show that a blood specimen was actually taken from him. His hospital chart reflected only that upon Brian's birth, the doctor routinely ordered that a PKU test be performed "on the day of discharge," and a notation of "009" following that order indicated that the

McKees were charged for the test when the order was transmitted from the nursery to Humana's laboratory. The record also shows that the night nursery staff forwarded the test order to the laboratory, and that the nurse made an entry in the nursery log book indicating that a PKU test would be performed. Although Brian's mother testified that he had a small bandage on his heel while hospitalized as a newborn infant, she could not recall whether she observed the bandage during his hospitalization immediately after birth or during a subsequent hospitalization a few days later. It was undisputed that a blood specimen was drawn from Brian during the second hospitalization.

Sally New, one of Humana's corporate representatives and the Director of Nursing Administration, testified that the fact of taking a blood specimen for a PKU sample was a significant piece of clinical information. She also affirmed the existence of standards by which Humana was required to ensure that recorded entries of all significant pieces of clinical information were made in patients' hospital charts.

The McKees introduced into evidence Humana's written "PKU Procedures" which provide a step-by-step outline of the actions which Humana personnel are required to take in obtaining PKU samples. Brian's chart reflects that in his case, requisite procedures were not met as follows:

1. The spaces for date and time on the requisition slip were left blank, as was the space for the initials of the person who drew the blood, and the lab technician did not stamp the requisition slip with the laboratory timer clock;

2. The lab technician did not date or initial the state laboratory 228 form (Lab 228 form) for PKU screening; and

3. According to the records of Brian's physician, the latter received no letter from Humana regarding the test results.

The record shows that the morning of the alleged test, May 4, 1977, was an unusually busy one, and that apparently one laboratory technician drew blood from seven infants for PKU testing and placed that

blood on the filter paper portions of Lab 228 forms. This unidentified technician failed to record his or her initials on the requisition slips or the screening cards, however, or to stamp the slips in any of the seven cases. Moreover, although each Lab 228 form is supposed to be marked with the infant's name and patient number, in Brian's case the night nurse mistakenly entered on the form the patient number of Brian's mother (60804–2) rather than that of Brian (60051–0). Brian's Lab 228 form does include a correction as to his patient number, as well as a handwritten notation as to the McKees' home telephone number, both of which were shown by the evidence to have been entered on the form after Brian's blood specimen allegedly was placed on the Lab 228 form and returned to the hospital laboratory.

Ordinarily, after conducting a PKU test, hospital laboratory personnel enter the child's name, patient number and other data into a PKU log book. The log book entry for Brian, however, erroneously included his mother's patient number rather than Brian's. The evidence also showed that although it was not customary for night nursery personnel to write telephone numbers on the Lab 228 forms, the May 4 Lab 228 forms for both Brian and a McCullah baby did contain telephone numbers. Moreover, the evidence showed that the Lab 228 forms identified Brian and the McCullah baby by nearly identical patient numbers (60804–2 and 60805–9), although Brian's actual patient number was 60051–0. Further, the evidence showed that the patient number of yet another baby boy in the nursery on May 4, the Ping baby, was 60408–2, which also was very similar to the patient number of 60804–2 erroneously listed on Brian's Lab 228 form.

Dr. Strand, Humana's Director of Pathology, testified that hospital procedures provide for a laboratory technician to obtain the Lab 228 forms from the nursery staff, and to then locate and identify the babies whose blood will be drawn. The foot of each baby's bassinet contains the baby's patient number, which the technician matches to the baby's patient number as shown on the Lab 228 form. The techni-

cian does not rely upon either the baby's name or the patient number shown on the requisition slip. The testimony adduced on behalf of the McKees therefore showed that on May 4, 1977, the unidentified technician who was attempting to find a baby boy with the erroneous patient number of 60804–2 would not have found Brian, as he was in a bassinet with his correct patient number of 60051–0.

Bernice Brown, a laboratory employee, testified that she noticed when Brian's Lab 228 form was brought to the laboratory that it was marked with the wrong patient number. She called the nursery to point out this mistake, but apparently nothing more was done to follow up this call.

In January 1984, which was several months after Brian's PKU was diagnosed, a Cabinet for Human Resources, Division of Maternal and Child Health employee in Frankfort, Beth Harp, received a telephone call from Humana's Medical Records Director, Judy Owens. Ms. Harp testified that Ms. Owens asked whether a positive PKU test had ever been obtained on Brian, and stated that Ms. Owens said "she had the chart in front of her and there was nothing written in the baby's chart about a PKU test; there was nothing in the chart ... there was not a positive; there was not a negative. There was nothing written in the chart." Ms. Harp further testified that Ms. Owens told her that normally Humana would have placed a copy of the PKU test result in the chart, and that the clinic where Brian's doctor worked also "had nothing in the chart." However, evidence was also adduced to show that although Brian's specialist for his PKU treatment, Dr. Mabry, apparently received no answer to two routine requests for Brian's birth chart after he began to treat Brian in 1983 and did not finally receive the chart until after this litigation began, at that time Brian's chart did contain a written notation which showed that a negative PKU test result had been received. Bernice Brown, the laboratory technician who earlier had attempted to look into the suspected mistake as to Brian's hospital number, only reluctantly conceded that she had no actual

memory of receiving and transcribing a negative test result.

Affirmative evidence was adduced by the McKees negating the probability that the state laboratory was negligent in testing the PKU blood specimen submitted by Humana. Further, Humana conceded in an interrogatory read to the jury that it knew of no facts which would indicate any faulty action by the state. The McKees also offered testimony through Suzanne Black and Dr. B.F. Brown regarding the procedures followed by the state laboratory.

Ms. Black, a microbiologist who was employed in 1977 as a state laboratory technician, testified regarding the state laboratory's written procedures for performing the Guthrie assay for PKU screening, and regarding the quality control procedures which "assured the consistency from test to test." She indicated that the screening test was designed to be "overly sensitive" so as to identify all babies who might possibly have the PKU disorder. Moreover, if there was any doubt as to the integrity of the testing procedure, such as if a testing tray of filter paper blood specimens was accidently knocked over, the tests were repeated on additional samples of blood-impregnated filter paper from the infants' Lab 228 forms. Finally, Ms. Black indicated that the state laboratory was adequately staffed and managed.

Dr. Brown, Director of the State Division of Laboratory Services in 1977, testified regarding the quality control of the PKU test. He testified that the Guthrie assay method is "one of the best controlled tests that I know of." Whenever a positive result occurred on one of the specimens being tested, the technician would repeat the tests on new filter paper samples from each of the subjects included in the first tray of specimens in order to verify both the positive result and the correct identity of the positive specimen so as to "make sure that there are no possibilities of clerical error in reporting." In regard to the Guthrie assay method, which includes twelve known controls on each tray of one hundred and one specimens, Dr. Brown testified in conclusion that "I don't know of

any other procedure that has that many safeguards in it. There's a very high number of known specimens to each known control to each batch."

Further, both Dr. Mabry and Dr. Guthrie, the inventor of the Guthrie assay method, testified that any blood specimen which might have been taken from Brian four days after birth would have tested positive for PKU. Although they recognized that the literature reports several instances of a so-called "biologic variation," both physicians rejected its application here.

Humana attempted to show that due to "biologic variations" which may cause the measurable levels of blood phenylalanine to rise unusually slowly, some PKU children do not test positive for PKU within their first few days of life. Humana's expert witness in this vein, Dr. Larry Cook, based his opinion on a 1983 article which, based upon letters, reported that there had been two Polish babies and one Australian baby who suffered from PKU but yet failed to test positive on days 1, 5 and 7 of life. However, Dr. Cook admitted that other unspecified conditions might have accounted for those "false negatives" and that the statistical occurrence of such "biologic variations," when the baby is tested on day 4 of life as was Brian, is .05%, or 1 out of 20,000, of all PKU babies. Since PKU babies constitute only 1 out of 15,000 babies screened in the United States it follows that only 1 out of 300,000,000 four-day-old screened babies might be a "biologic variant." Moreover, Dr. Cook admitted that in twenty-five years of PKU screening, there has not been one reported incident of a "biologic variation" in the United States or one documented case report of a "biologic variation" worldwide.

The trial was bifurcated into two phases upon Humana's motion. The jury first returned a unanimous verdict as to liability. After the damage phase was submitted, the same jury returned an 11–1 combined verdict for Brian and his father in the total amount of $5,504,271.68. These appeals followed.

## II.

## Humana's Appeal

### a. Directed Verdict

First, Humana contends that the court erred by failing to grant its motions for a directed verdict. Humana argues that three possibilities exist to explain Brian's negative test result. It states that those possibilities are that the hospital negligently failed to collect a blood specimen from Brian as was contended at trial, that the state lab was negligent in its duties, or that Brian is the first documented case in the United States involving a "biologic variation." According to Humana, the McKees failed to meet their burden of both showing by their proof that the hospital was probably rather than merely possibly negligent in failing to collect a blood specimen from Brian, and eliminating all reasonable possibilities for this negative PKU test result other than the hospital's negligence. Humana urges that the evidence adduced at trial required the jury to speculate as to who, if anyone, was negligent in this case and therefore that the evidence was not sufficient to support a verdict.

Specifically, Humana cites to the testimony by the McKees' expert and the inventor of the Guthrie assay method, Dr. Robert Guthrie, that it is impossible to scientifically know whether the error in Brian's case resulted from a clerical mistake of some kind at the hospital or from a mistake at the state laboratory. Further, Dr. Guthrie stated that it usually cannot be determined why missed cases such as Brian's occur, but that Brian could have been a case of "biologic variation." According to Humana, since Dr. Guthrie could not determine which of the possibilities explained Brian's negative test result, a jury should not have been allowed to speculate in this vein.

Moreover, Humana argues that the evidence adduced shows that the hospital exercised ordinary care in collecting Brian's blood specimen. Humana bases its argument upon evidence which was summarized in its brief as follows:

1) It was established at trial that Brian's hospital records contained an order from the physician for a PKU test to be performed and that the doctor's order had a routine notation on it by a nurse that the order was carried out;

2) Brian's medical record contained a laboratory requisition slip, generated by the nursery at 4:57 a.m. on May 4, 1977, indicating that the laboratory was directed to draw blood for the PKU test that morning; the hospital's nursery log book also shows that Brian's test for PKU was ordered on May 4, 1977;

3) The hospital's pathology department's log book shows that Brian's blood was transmitted to the state laboratory on May 4, 1977 and that a negative result was received back from the state laboratory on May 19, 1977; and

4) The laboratory requisition slip, signed by Bernice Brown, the laboratory clerk, shows that the state laboratory reported the test result for the PKU test as negative, and that the result was received from the state laboratory on May 19, 1977. (Omitting Humana's supportive references to the record.)

In addition, Humana relies upon the evidence that the original PKU test results for Brian and six other infants who had blood drawn on May 4 were in the possession of a Somerset pediatric clinic, and upon Mrs. McKee's prior inconsistent testimony on two occasions to the effect that Brian had a bandage on his heel during his birth admission which indicated that blood had been drawn from him for a PKU test. The latter evidence tended to impeach her testimony on direct examination at trial that she could not remember during which of his two separate admissions in May 1977 he had a bandage on his heel. Finally, Humana relies upon testimony by a state laboratory employee that errors could and did occur at that facility and testimony by several expert doctors concerning the concept of Brian being a "biologic variant." Based upon the evidence summarized above, Humana argues that there was not enough proof to show that the hospital was probably negligent, or to eliminate the other reasonable possibilities for the negative PKU test result. Citing numerous authorities, it therefore argues that it was entitled

to a directed verdict. We are constrained to disagree.

■ In recent years, the standard for our review of cases in order to determine whether a trial court has erred by failing to grant a motion for a directed verdict has undergone significant change. The rule to which we presently are bound to adhere is set forth in *Lewis v. Bledsoe Surface Mining Company*, Ky., 798 S.W.2d 459, 461–462 (1990), as follows:

> Upon review of the evidence supporting a judgment entered upon a jury verdict, the role of an appellate court is limited to determining whether the trial court erred in failing to grant the motion for directed verdict. *All evidence which favors the prevailing party must be taken as true and the reviewing court is not at liberty to determine credibility or the weight which should be given to the evidence,* these being functions reserved to the trier of fact. *Kentucky & Indiana Terminal R. Co. v. Cantrell,* 298 Ky. 743, 184 S.W.2d 111 (1944), and *Cochran v. Downing,* Ky., 247 S.W.2d 228 (1952). *The prevailing party is entitled to all reasonable inferences which may be drawn* from the evidence. Upon completion of such an evidentiary review, the *appellate court must determine whether the verdict rendered is* "'*palpably or flagrantly*' *against the evidence so as* '*to indicate that it was reached as a result of passion or prejudice.*'" *NCAA v. Hornung,* Ky., 754 S.W.2d 855, 860 (1988). If the reviewing court concludes that such is the case, it is at liberty to reverse the judgment on the grounds that the trial court erred in failing to sustain the motion for directed verdict. Otherwise, the judgment must be affirmed. (Emphasis added.)

As we view this directive, we are no longer free to analyze cases, as Humana suggests, in terms of the weight and value of the evidence. Indeed, *Lewis* specifically directs that we should ignore all issues of credibility and weight of the evidence, and that we should instead treat all evidence in favor of the prevailing party as true and give that party all reasonable inferences which may be drawn from the evidence.

Once having done that, our inquiry is then limited to the issue of whether the verdict is so palpably or flagrantly against the evidence as to indicate that it was reached as a result of passion or prejudice. Obviously, the *Lewis* test is a much more liberal standard than that which was followed by the court in earlier cases. In fact, as we view the matter, except in the most extreme circumstances the present test in effect prevents this court from reversing a judgment on the ground that the trial court erred by failing to grant a motion for a directed verdict.

■ As noted by the McKees, the evidence adduced below which was favorable to them must be taken as true, and they must be given the benefit of all reasonable inferences which might legitimately be drawn from that evidence. *Lewis, supra.* The McKees assert in their brief that substantive evidence established and supported the following facts and reasonable inferences in their favor:

1. There is not one record entry that a PKU blood specimen was taken from Brian, nor is there a record of the technician who would have taken it, nor the time taken.

2. The lab technician taking any blood specimens had had only the Lab 228 form. Brian's Lab 228 form incorrectly listed his hospital number. Any lab technician looking for a baby in the nursery with a hospital number of "60804–2" would not have found Brian's. Instead, there were three babies with numbers similar to that listed, 60408–2, 60805–9 60384–5.

3. The laboratory technician did not discover the error in the hospital number, and must have *thought* he took a blood specimen from a baby with a hospital number of 60804–2 on the specimen card titled Brian McKee. That blood specimen would not have been from Brian McKee.

4. To assure the accuracy of the blood specimens, and to assure that they are taken from the correct patient, Humana's protocol required five steps which were not performed: no initials, time or

timer clock on the laboratory requisition slip, and no initials or date on the lab form.

5. When the specimen card bearing Brian's name—but not his blood—was delivered to Humana's pathology lab, the mistake in the source of the specimen was noted but *never* corrected.

6. In 1984, Humana's Director of Medical Records, well familiar with reading charts, advised an independent witness that Brian McKee's hospital chart did not indicate any result whatsoever of a PKU test.

7. Humana stonewalled Dr. Mabry when he twice requested Brian's complete birth record in 1983.

8. Mrs. McKee testified that she did not remember whether the band-aid she once saw on Brian's heel was from Brian's birth admission or his admission two weeks later, when the chart indicated that Brian had a CBC test performed, which also would have required a heel stick and a band-aid.

9. The State Laboratory had extensive quality control procedures assuring accurate administration of the PKU test. The State Laboratory had extensive procedures to ensure the absence of testing errors.

10. Humana admitted it knew of no evidence indicating neglect on the part of the State Laboratory.

11. There is no basis for concluding that Brian McKee might have been a "biologic variant," (a 1 out of 300,000,000 chance).

Our reading of the transcript of the trial convinces us that based upon the evidence adduced at trial, a jury could reasonably have made the inferences enumerated above. Although we might have reached a different conclusion than that of the jury, we are unable to conclude that the verdict is so palpably or flagrantly against the evidence as to indicate that it was reached as a result of passion or prejudice. Consistent with *Lewis*, therefore, we hold that the court did not err by denying Humana's motion for a directed verdict.

Moreover, we note that the line of cases cited and relied upon by Humana, such as *Huffman v. SS. Mary and Elizabeth Hospital*, Ky., 475 S.W.2d 631 (1972), and *Briner v. General Motors Corp.*, Ky., 461 S.W.2d 99 (1970), simply has no application to the instant action. In each of those cases the court was concerned with the issue of causation and whether the proof was sufficient to establish the probability that the alleged negligence of the defendant caused the damages and injuries sustained by the plaintiff. Here, by contrast, the principal issue was whether Humana was negligent by breaching its duty to administer a PKU test to Brian. There was no significant dispute that, if Humana was negligent and failed to send a specimen of Brian's blood to the state laboratory for testing, this was the cause of the failure to diagnose him as suffering from PKU. This is particularly true since Humana admitted it had no proof that the state laboratory erred in conducting a test on the specimen it received, and the evidence as to Brian being a "biologic variant" was so extremely speculative as to make it questionable as to whether that evidence was sufficient to create even so much as a possible explanation for Brian's negative test result. In short, unlike the situations in the cases cited by Humana, the evidence as a whole was clearly sufficient to establish that if Humana was negligent, its negligence was a probable cause of the failure to diagnose Brian as suffering from PKU.

### b. Vivian Sullivan's Testimony

Vivian Sullivan, a registered nurse, was designated as Humana's corporate representative and was permitted to sit at a table with Humana's counsel during the course of the trial. Ms. Sullivan was called as a witness by the McKees on the fourth day of trial. Humana contends that several prejudicial errors occurred during her testimony.

The first problem arose at the lunch recess. At that time, Ms. Sullivan was in the middle of her testimony as if on cross-examination as a hostile witness. Up until that point, she had been both contentious and evasive on some points. After the jury

left the courtroom, the McKees' counsel made a motion that Ms. Sullivan not be permitted to talk to Humana's attorneys during the recess. Over objection, the court ruled that Ms. Sullivan could talk with Humana's attorneys but that she could not discuss her testimony with them until after the McKees' counsel finished examining her. Citing *Reams v. Stutler*, Ky., 642 S.W.2d 586 (1982), Humana argues that the court's ruling amounted to reversible error. For the reasons set out below, we disagree.

■ True enough, it would appear that *Reams* teaches that it is an abuse of a trial court's discretion to refuse counsel permission to confer with his or her own witness during a recess which interrupts the witness's examination by opposing counsel. This would be particularly true in a case, such as this, where the person being examined was a designated corporate representative and therefore was more than a mere witness. However, before the court's judgment may be reversed on this ground, counsel must demonstrate that some type of prejudice resulted. Here, Humana's attorneys identified no prejudice which resulted from their inability to confer with Ms. Sullivan during the recess. Moreover, Humana's counsel not only chose not to avail themselves of the opportunity afforded by the trial court to discuss Ms. Sullivan's testimony with her before examining her but, indeed, they made a point of informing the jury that they had not discussed Ms. Sullivan's testimony with her during the course of the trial. Because we are satisfied that no prejudice to Humana resulted from the court's erroneous ruling, and because Humana's counsel declined their opportunity to discuss Ms. Sullivan's testimony with her at another point in the trial, we conclude that no reversible error occurred.

Next, Humana complains about an incident which occurred during Ms. Sullivan's testimony, shortly after the McKees' counsel began to reexamine her after the noon recess. Counsel inquired as to how many times Ms. Sullivan had met with Humana's counsel to prepare for her testimony at trial, but Ms. Sullivan at first denied that they had discussed her testimony. The McKees' counsel persisted and Ms. Sullivan then admitted that she and Humana's counsel had engaged in discussions, but claimed that those discussions did not involve her testimony. Ms. Sullivan then refused to directly answer certain additional questions, choosing instead to be evasive and unresponsive. At this point, the court admonished her to answer the questions without trying to take into account the consequences of each answer, and indicated that she could explain her answers if necessary. Ignoring the court's admonition, Ms. Sullivan was unresponsive and evasive when answering the very next question. Obviously exasperated, the trial judge loudly exclaimed: "I'm not going to say it again. Answer the question!" Simultaneously, the judge struck his pen on the bench.

Humana argues that the court's outburst violated the judge's duty to remain impartial and to refrain from communicating his personal feelings to the jury. It is argued that by engaging in such conduct, the court discredited Humana's representative and prevented Humana from receiving a fair trial. We disagree.

■ In the circumstances presented, we decline to hold that this incident amounted to reversible error. The trial court was in the middle of attempting to fairly and expeditiously conduct a complex and lengthy trial. Ms. Sullivan was impeding these efforts by being evasive and unresponsive to the questions asked of her. After politely having been admonished at length to simply answer the questions, she immediately proceeded to avoid making a direct answer to the very next question which was asked. Understandably, the court became exasperated and forcefully ordered her to answer. Given the fact that Humana's witness precipitated this incident by her own conduct, Humana is hardly in a position to complain about the incident on appeal. Further, in any event we do not view the incident as having been sufficiently egregious to warrant a reversal of the judgment.

Next, Humana contends that three separate and extremely prejudicial errors were

committed by the trial court during the course of the McKees' counsel's efforts to impeach Ms. Sullivan on a collateral matter. The record shows that Ms. Sullivan testified that during the seven-year period preceding the trial, she had met twice with one of Humana's attorneys about this case. This testimony was completely at odds with an affidavit which Humana's counsel filed shortly before trial in support of a motion asking that Ms. Sullivan be permitted to serve as Humana's designated representative at the trial. That affidavit stated in pertinent part as follows:

2. Ms. Sullivan has actively consulted with counsel for Humana Hospital Lake Cumberland since 1986. She has assisted counsel in reviewing pertinent documents and in preparing witnesses for depositions and trial. Ms. Sullivan has been counsel's principal contact at Humana Hospital Lake Cumberland in preparing this case for trial.

3. Counsel for Humana Hospital Lake Cumberland have worked closely with Ms. Sullivan over the past several months in preparing for trial, and her knowledge of the case and the Nursery are extremely important to counsel at trial.

After Ms. Sullivan inaccurately testified regarding her discussions with counsel, the court took a recess and an extended argument ensued in chambers as to the best method for permitting Ms. Sullivan to be impeached in this vein. Finally, the court ruled that the fairest course of action was either to have her questioned about the subject by Humana's counsel, or to permit Humana's counsel to be called as a witness and to be asked questions which effectively would impeach Ms. Sullivan. Humana's counsel objected to both alternatives but then proceeded to ask Ms. Sullivan certain questions in open court which touched on the subject at issue. However, counsel failed to specifically ask her how many times she either had discussed the case with counsel or had met with counsel to discuss her testimony. The McKees' counsel immediately objected to the limited nature of the questions asked, and at a bench conference the court finally ruled that he

would allow Humana's counsel to be called as a witness and to be questioned regarding the contents of the affidavit which conflicted with Ms. Sullivan's testimony in open court. This latter ruling was made after Humana's counsel indicated that the questions which he already had asked Ms. Sullivan were sufficient for impeachment purposes, and that he saw no need to ask her any additional questions.

The trial court disagreed and permitted the McKees' counsel to announce in open court that their next witness would be Frank Doheny, Humana's counsel. Mr. Doheny's objection to being called as a witness was overruled and the court audibly asked him to raise his right hand and be sworn. However, the court then stopped short of swearing him as a witness and conducted yet another bench conference out of the hearing of the jury. During this conference the court determined that in lieu of permitting the McKees to call Mr. Doheny as a witness, he would permit the McKees' counsel to read the above-quoted affidavit to the jury.

Humana argues that this series of events ultimately resulted in Ms. Sullivan being improperly impeached as to a collateral issue, i.e., her trial preparation. Moreover, Humana argues that this error was enhanced by the manner in which the court permitted the impeachment to occur by first ordering Humana's counsel to ask Ms. Sullivan questions, then permitting counsel to be called as a witness, and finally allowing counsel's affidavit to be read to the jury. According to Humana this bizarre series of events, which lasted about one and one-half hours and included both bench and in-chambers conferences, deprived it of a fair trial. We disagree.

■ During the course of questioning Ms. Sullivan, subsequent to the completion of her examination by the McKees' counsel, Humana's counsel asked her the following question:

Q.48 Okay. And have you and I discussed your testimony in any way, shape, or form since you first testified here today?

**A. No.**

This question and answer could have given the jury the impression that Ms. Sullivan was an unbiased and disinterested witness whose testimony had not previously been discussed in any way with Humana's counsel. On redirect examination, therefore, counsel for the McKees was entitled to impeach Ms. Sullivan by showing that although she may not have discussed her testimony with counsel on the day of trial, she did do so on numerous occasions before the trial and was not unbiased and disinterested. In short, the line of questioning pursued by the McKees' counsel was proper impeachment because it tended to show Ms. Sullivan was a biased, prejudiced, and interested witness. Thus, we conclude that the collateral facts doctrine simply did not apply to the situation at issue. Since this is the only allegation of error advanced by Humana respecting this scenario of events, there is no basis for reversing the court's judgment as a result of the efforts of the McKees' counsel to impeach Ms. Sullivan. *See generally* R. Lawson, *Kentucky Evidence Law Handbook* § 4.05 (2d ed. 1984).

**c. Court's Instructions**

Next, Humana contends that the court committed three errors in instructing the jury. We disagree.

Humana first argues that the court erred by instructing the jury as to its statutory duty to cause a PKU test to be administered to Brian because in hospital liability cases, the proper instruction is an ordinary care instruction. *Rogers v. Kasdan*, Ky., 612 S.W.2d 133 (1981). This contention is untenable.

In *Rogers*, the court found error in the instructions because they were too detailed and because they imposed more duties upon the defendant hospital than the law required. However, the court did not hold, as Humana suggests, that the duty instructions in a hospital liability case must be limited to a single instruction on ordinary care. On the contrary, hospitals are required to comply with many statutory duties in addition to that of exercising ordinary care. If a plaintiff, as here, in part

bases his or her claim upon proof as to a hospital's negligent failure to comply with a statutory duty, the court obviously is required to instruct the jury regarding that duty because the violation of such a duty, standing alone, may be sufficient to support a claim of negligence. *Rietze v. Williams*, Ky., 458 S.W.2d 613 (1970).

Next, Humana contends that the court erred by giving both an instruction as to its statutory duty and an instruction as to its duty to exercise ordinary care. Again, we disagree.

As noted earlier, *Rogers v. Kasdan, supra*, does not hold that the duty instructions in a hospital liability case must be limited to one instruction on the duty to exercise ordinary care. More importantly, it is clear that the instructions given by the court below instructed the jury on mutually exclusive theories of liability. Instruction No. 2a dealt with the hospital's statutory duty to comply with KRS 214.155, while Instruction No. 2b dealt with the hospital's duty to exercise ordinary care in complying with the procedures it had established for carrying out its statutory duty. Contrary to Humana's contention, we do not perceive that these two instructions imposed two duties of care for the same act. Indeed, proof was adduced with respect to both duties and the jury found that Humana had failed to comply with both duties. In last analysis, we find that the issue in this case is indistinguishable from that present in other cases, such as actions arising out of simple automobile accidents, in which trial courts routinely instruct upon both statutory and common law duties.

Finally, Humana argues that Instruction No. 2b had the effect of demanding more of it than the law requires because it not only imposed a duty upon the hospital to exercise ordinary care in administering the PKU test, but it also imposed a duty upon the hospital to establish and comply with procedures regulating the administration of the test. However, we agree with the trial court that the phrase "in establishing and following procedures" in Instruction No. 2b did not impose a separate legal duty upon Humana but, rather, merely served as

qualifying language which the court utilized in defining Humana's duty to exercise ordinary care. Moreover, we reject Humana's argument that Instruction No. 2b violates the dictates of *Rogers v. Kasdan, supra,* in any respect.

### d. Denial of Access to Records

Apparently, in the sealed record of a malpractice action filed in the Pulaski Circuit Court against the McKees' previous attorney, involving an unsuccessful claim filed against the Cabinet for Human Resources stemming from Brian's missed PKU diagnosis, there is an affidavit of an expert from the Center for Disease Control that any negligence "in the testing or analysis of lab results" was on the part of the state laboratory and not Humana. The trial court denied Humana's February 18, 1991, motion seeking an order permitting it to examine the sealed record. We conclude that there was no error in the court's ruling in this vein.

■ In the first place, we fail to perceive any relevance between an affidavit pertaining to laboratory responsibility in the event of negligent testing and analysis of a laboratory blood specimen, and the issue of possible negligence by Humana in failing to draw a PKU test specimen from Brian. Moreover, although Humana learned of the existence of the affidavit on December 5, 1990, it failed to file a written motion to inspect the affidavit until February 18, 1991, which was three days after the deadline established by the court for filing pretrial motions. It is significant that this deadline was established in an order entered two days after the December 5 pretrial conference at which Humana learned about the affidavit. It follows, therefore, that there was no abuse of discretion in the court's denial of the motion to inspect the record in the malpractice action.

Further, we note that even if there had been an abuse of discretion, Humana has failed to designate the sealed record as part of the record in this appeal. Hence, in any event we would be unable to determine whether the denial of the motion was so prejudicial as to justify reversal on this ground.

### e. Miscellaneous Errors

Next, in a shotgun approach Humana advances six separate errors, each of which it urges was sufficient to deprive it of a fair trial.

■ First, Humana argues that the court erred by permitting the McKees to introduce into evidence the guidelines of the Joint Commission on Accreditation of Hospitals (JCAH) and copies of certain federal regulations. According to Humana, admission of this evidence was erroneous and prejudicial because it was irrelevant, inadmissible, and immaterial. Humana again cites *Rogers v. Kasdan, supra,* in support of its argument. However, *Rogers* does not address this issue except to acknowledge that evidence constituting criteria the jury might rely upon in deciding the question of ordinary care, including evidence as to proper supervision of staff and record keeping, is admissible. Both Dr. Strand (Humana's Laboratory Director) and Dr. Mabry testified below that essentially all of the JCAH guidelines and federal regulations introduced by the McKees set forth reasonable standards which a hospital should follow in complying with its duty of ordinary care in drawing blood specimens from patients. In our opinion this evidence, although not admissible to establish the standard of care required of Humana, was admissible to show the procedures which a reasonably prudent hospital, in like or similar circumstances to Humana, would follow in drawing a patient's blood specimen. Further, it gave the jury some reasonable criteria to utilize in determining whether the procedures which Humana claimed it followed in Brian's case complied with its duty of ordinary care. Therefore, we conclude that this evidence was relevant, admissible, and material to the issue submitted to the jury by Instruction No. 2b. Moreover, the fact that these guidelines and regulations may be voluntary does not detract from the fact that they provided useful information which the jury could utilize in reaching its decision. Addi-

tionally, Humana's complaint that it was not allowed to introduce evidence that it complied with these regulations and guidelines is also without merit. As noted by the McKees, Humana introduced a great deal of evidence by which it attempted to show that it had established the necessary procedures required for drawing blood specimens from patients, that it complied with those procedures, and that it kept adequate records. The only evidence which the court excluded was that which was offered regarding the issue of whether the hospital was accredited by JCAH. However, this evidence was irrelevant to the issue of whether Humana complied with its duty of ordinary care. Finally, in any event, this excluded evidence was not made part of the record by avowal and hence, the issue was not properly preserved for review.

Second, Humana argues that the trial court erroneously permitted the McKees' expert to testify as to the standards imposed upon hospitals, but prohibited the hospital's expert from testifying that Humana exercised ordinary care. Humana urges that if one party is permitted to introduce expert testimony, the other party must also be permitted to put on expert testimony of essentially the same nature. We disagree.

■ The excluded evidence involved a general question asked of Humana's expert, Dr. Larry Cook, pertaining to whether he had formed an opinion as to whether the hospital care received by Brian was consistent with that normally provided by other hospitals for other children in similar circumstances. This question was improper because it inquired as to the doctor's conclusion regarding the legal issue of whether Humana exercised ordinary care. As a nonlegal expert witness clearly is not entitled to express an opinion as to a legal issue, this testimony was properly excluded. Moreover, contrary to Humana's contention, the record does not show that the McKees were allowed to introduce evidence through their expert to show that Humana violated its duty of ordinary care.

■ Third, Humana contends the court erred by permitting the McKees to depose

Dr. Richard H. McChave subsequent to the deadline set for discovery. However, even if this was an abuse of discretion, Humana was not prejudiced by the error since the deposition was not read to the jury. Further, we find no error in the court's denial of Humana's motion to obtain a blood specimen from Brian to investigate the possibility that his problems were due to a fragile X chromosome rather than PKU. The court's order of December 7, 1990, provides ample basis for the denial of this motion.

■ Fourth, Humana complains about the court's denial of its motion to depose certain unidentified witnesses employed by CHR and two health departments. This motion was filed on February 7, 1991, which was less than one month prior to trial. Since it is clear that Humana had ample opportunity to take such depositions within the time allowed for discovery, we find no abuse of discretion in the court's denial of the motion on the ground that it was untimely. This is especially true since in these circumstances we have no way of knowing what the unidentified witnesses might have said at trial or whether the denial of their testimony prejudiced Humana in any respect.

■ Fifth, Humana contends that the court erred by permitting the McKees to introduce into evidence certain Lab 228 forms and laboratory requisition slips pertaining to other babies. Humana urges that the introduction of this evidence amounted to an impermissible introduction of other acts of the party whose acts are in question to prove the commission of the acts in controversy. We disagree. As noted by the McKees, this evidence was relevant to show the unusually large number of babies in the nursery on the day Brian was tested, the similarities in their hospital numbers, and the potential which existed for making mistakes in testing the correct babies. This evidence was not introduced, as Humana suggests, for the purpose of proving that Humana made errors in testing any other babies that day and therefore must have erroneously failed to test Brian as well. We find no error in the admission of this evidence.

■ Sixth, Humana argues that the court erred by permitting Dr. Mabry to testify that he did not receive Brian's medical records from the hospital when he requested them in 1983, and to thereby suggest that Humana intentionally withheld the records. Humana asserts that this evidence was highly prejudicial and lacked probative value because the records had no bearing on the treatment Brian received. However, as noted by the McKees, this evidence was admissible as bearing on the issue at trial as to whether the notation that a negative PKU test was received on May 19, 1977, was actually not entered in the hospital's records until after Dr. Mabry requested Brian's records some six years later. Therefore, we find no error in admitting this testimony.

In summary, we are of the opinion that the errors, if any, assigned by Humana in Part V of its brief were neither singularly nor collectively egregious enough to warrant the reversal of the trial court's judgment.

#### f. Excessive Damages

Finally, Humana argues that the jury awarded excessive damages, particularly in regard to the award of $1,000,000 for Brian's pain and suffering. Again, we disagree.

■ This issue is governed by the supreme court's decisions in *Cooper v. Fultz*, Ky., 812 S.W.2d 497 (1991), and *Davis v. Graviss*, Ky., 672 S.W.2d 928 (1984). As explained in *Hazelwood v. Beauchamp*, Ky.App., 766 S.W.2d 439 (1989), the *Davis* standard on appeal for determining whether the trial court abused its discretion by not awarding a new trial on the ground that the award of damages was excessive is as follows:

> The amount of damages is a dispute left to the sound discretion of the jury, and its determination should not be set aside merely because we would have reached a different conclusion. If the verdict bears any reasonable relationship to the evidence of loss suffered, it is the duty of the trial court and this Court not to disturb the jury's assessment of damages.

*Hazelwood, supra* at 440. It therefore follows that this court may reverse the trial court's order only if the latter was clearly erroneous. *Cooper, supra.*

■ Here, the jury's verdict clearly bears a reasonable relationship to the evidence adduced below regarding the losses sustained by Brian. Indeed, Humana's argument is limited to a general allegation that the jury's verdict was excessive and the result of passion or prejudice, and the cases cited in support of its contention are outmoded and impliedly overruled by *Davis, supra.* More importantly, we find no merit in Humana's argument that the damages awarded by the jury were excessively disproportionate to the actual damages suffered. On the contrary, as we view the matter, just the opposite is true. Finally, we also reject Humana's argument that the award of $1,000,000 for pain and suffering amounted to an impermissible award of hedonic damages. The jury was instructed to make an award for the mental and physical pain and suffering which Brian has incurred and will continue to incur in the future. Given the evidence adduced as to Brian's physical and mental limitations, and as to his awareness of them, the award for past and future pain and suffering is clearly not excessive.

### III.

#### McKees' Cross Appeal

■ The McKees argue that the court erred by refusing to instruct the jury that they could award damages to Mr. and Mrs. McKee for the loss of Brian's companionship, love and affection. We disagree.

As the McKees admit in their brief, there is no Kentucky law which authorizes the giving of such an instruction, and we are not persuaded by their argument that such a recovery should be permitted. We further note that numerous other courts which have considered the issue have refused to allow such a recovery. *See, e.g., Siciliano v. Capitol City Shows, Inc.*, 124 N.H. 719, 475 A.2d 19 (1984). *See generally* Annot., 54 ALR 4th 112 (1987). We therefore hold

that the court did not err by denying the McKees' tendered instruction in this vein.

Because we have not granted Humana a new trial, we need not address the remaining issues raised in the McKees' protective appeal.

The court's judgment is affirmed.

All concur.