Mary HAMBY, Administratrix of the Estate of Glennie S. Johnson, Appellant,

v.

UNIVERSITY OF KENTUCKY MEDICAL CENTER, Also Known As Albert B. Chandler Medical Center and University Hospital; and Yosh Maruyama, M.D., and Cynthia D. Wills, R.T. (R), Individually and as Agents or Employees of University of Kentucky Medical Center, A/K/A Albert B. Chandler Medical Center and University Hospital, Appellees.

No. 91–CA–1549–MR.

Court of Appeals of Kentucky.

Sept. 18, 1992.

Discretionary Review Denied by Supreme Court Feb. 10, 1993.

Daniel A. Simons, James E. Thompson, Burnam & Thompson, P.S.C., Richmond, for appellant.

Scott T. Wendelsdorf, Ogden, Sturgill & Welch, Louisville, for appellees.

Before GARDNER, HAYES and HOWERTON, JJ.

HOWERTON, Judge.

Mary Hamby appeals from a jury verdict and judgment dismissing her medical malpractice claim against the University of Kentucky Medical Center, Yosh Maruyama, M.D., and Cynthia D. Wills, R.T. Hamby brought this action as administratrix of the estate of Glennie Johnson. She argues that the trial court's instructions were erroneous in that they did not specify the duties imposed by law on Dr. Maruyama and that the court did not instruct the jury on the issue of the Medical Center's independent negligence. She also argues that she was entitled to a judgment notwithstanding the verdict because the jury found that Dr. Maruyama was negligent in his treatment of Glennie Johnson. Although the jury did find the doctor to be negligent, it also determined that the negligence did not cause Glennie Johnson's injuries. We have reviewed the record and briefs, and considered the arguments of each party, and we find no reversible error. We therefore affirm the judgment of the Fayette Circuit Court.

Glennie Johnson had suffered with cancer problems in her neck area since 1969. Numerous operations had been performed on her which resulted in substantial disfigurement and paralysis to the left side of her face. She had undergone almost every known treatment for her problem.

In 1983, a new option became available. It was an experimental treatment called hyperthermia, which is a heat device to kill cancerous tissue. Although Johnson's condition made her a questionable candidate for this new treatment, the medical staff at the hospital nevertheless decided to proceed with this treatment. During the treatment, Dr. Maruyama and his technical assistant, Ms. Wills, opted to use surface mounted temperature probes instead of interstitial probes which were required by

certain protocols and regulations previously adopted. Ms. Johnson simply did not have enough tissue in the treatment area for the deeper temperature probes. Following the session of treatment, her left lower ear appeared pale, and that part of the ear eventually became necrotic and had to be removed. Ms. Johnson died from other problems a short time thereafter. Hamby filed this malpractice action, seeking damages for the injury to Ms. Johnson's ear.

At trial, there was conflicting testimony on practically every issue, and at the conclusion of the trial, the jury found that Dr. Maruyama did deviate from the established protocol and standard of care but that the deviation had not caused Johnson's injuries. Hamby has now appealed that decision.

She first argues that the jury instructions were erroneous in two ways. She claims that since regulations imposed specific requirements on the users of the experimental device, the "bare bones" instructions given to the jury were insufficient. In pertinent part, the jury was instructed:

It was the duty of the defendant, Yosh Maruyama, M.D., in the diagnosis, care and treatment of Glennie S. Johnson, to exercise that degree of care and skill expected of an ordinary, prudent and competent physician specializing in radiation oncology and trained in the use and administration of hyperthermia.

Hamby contends that the instruction is insufficient because, where statutory duties exist in a negligence case, the trial court must issue instructions which advise a jury of those specific duties, citing an automobile accident case, *Wemyss v. Coleman*, Ky., 729 S.W.2d 174 (1987). Hamby alleges that since there are regulations and a specific protocol adopted by the Medical Center, the instructions should have included (1) a duty to obtain informed consent; (2) a duty to use the equipment in accordance with the BSD manual, the Medical Center protocol, and conditions imposed by the FDA; (3) a duty to notify and obtain permission from BSD, the institutional review board, and the FDA before deviating from protocol; (4) a duty to notify BSD after the fact that a burn had occurred; and (5) a duty to keep adequate records of the hyperthermia procedure.

■ We disagree that the specific enumerated duties should have been included in any instruction. Although statutory duties have been used to enumerate specific duties in certain types of automobile accident cases, we have traditionally excluded them in medical malpractice cases.[1]

We find in *Rogers v. Kasdan*, Ky., 612 S.W.2d 133, 136 (1981):

The general rule for the content of jury instructions on negligence is that they should be couched in terms of duty. They should not contain an abundance of detail, but should provide only the bare bones of the question for jury determination. This skeleton may then be fleshed out by counsel on closing argument.

*Rogers* was a medical malpractice case wherein Rogers sought to have specific duties included in the jury instructions. The court ruled:

Whether the hospital hired knowledgeable nurses, or had proper supervision for staff physicians, or accurate record keeping, and so forth, were all evidently questions for the jury to consider. While they constituted criteria that the jury might use to decide the question of ordinary care, listing them in this manner was not necessary to pose the issue of the hospital's duty.

---

1. An exception to the general rule was carved out by this Court when it affirmed the Pulaski Circuit Court's instruction which specified a hospital's duty to administer a PKU test to newborn infants as required by KRS 214.155. *Humana of Kentucky, Inc. v. McKee*, Ky.App., 834 S.W.2d 711 (rendered August 7, 1992). Because the statute was so specific, the expert testimony supported the duty, and failure to perform the required test was a clear substantial factor in causing McKee's problems, we can distinguish that case from the case at bar. Here, the experts varied significantly as to the actual necessity for using interstitial probes, especially under the facts in this case. We do not have such a specific statute, and we conclude that the Fayette Circuit Court did not commit reversible error by refusing to include specific duties in its instructions.

In addition, the instructions should not make a rigid list of ways in which a defendant must act in order to meet his duty.

*Rogers,* 612 S.W.2d at 136.

Medical cases and duties of care for certain types of treatment must be based on expert testimony. Although there are rules to be followed, including administrative regulations and in some cases statutes, the enumeration of specific duties is merely to amplify the requirements of the general duty to use ordinary care, and it does not expand such duties. There is a vast difference between automobile accident cases and medical negligence cases. In all cases, there is a duty to exercise ordinary care, but in automobile cases, ordinary care would be following statutory duties of obeying stop signs, yielding a right-of-way, and observing speed laws, etc., whereas in the practice of medicine, there are numerous variables which must be taken into account in each specific case. Specific enumeration of duties would tend to overemphasize the requirement rather than to create or expand the duty. Even in *Wemyss,* we read:

> The "general duty," breach of which gives rise to liability, is the duty to exercise ordinary care, and properly drafted instructions utilize "specific duties" as imposed by statutes *only as amplification* of the "general duty," and *not as the source* of such duty. Where there is a statutory duty, the usual instruction, after explaining the general duty, will then specify that such general duty "includes" certain enumerated specific duties. (Emphasis added.)

*Wemyss,* 729 S.W.2d at 180.

The specific duties enumerated by Ms. Hamby were presented at great length through the expert testimony, exhibits, and arguments of counsel to be part of the "care and skill expected of an ordinary, prudent and competent physician specializing in radiation oncology and trained in the use and administration of hyperthermia." (See actual jury instructions.) The actual instruction was quite proper. The jury had the evidence of the experts and the acceptable procedures for hyperthermia treatment, and it had the information concerning the procedures followed by Dr. Maruyama in administering the hyperthermia treatment. It was up to Hamby's counsel during closing argument to flesh out and explain any violation of the appropriate standard of care, and to show that the violation was the cause of any resulting injury.

Hamby also argues that *Risen v. Pierce,* Ky., 807 S.W.2d 945 (1991), requires that the specific duties be enumerated in the instructions. Again, we disagree. *Risen* was another automobile case, and is distinguishable also in that it dealt with an "undisclosed duty" concerning statutory requirements pertaining to a one-lane bridge. In our case there was no "undisclosed" specific duty, as they had all been explained through expert testimony and exhibits. 2 J. Palmore & R. Eades, *Kentucky Instructions to Juries* §§ 16, 23 (1989), makes it clear that more specific instructions are given in automobile cases than in medical malpractice cases. There are numerous specific instructions to give to juries when there is an automobile collision, because the jury would not otherwise be aware of those specific duties and statutes governing driving. However, in medical malpractice cases, expert testimony is always used to show the standard of care for a particular type of practice and procedure. The standard of care for physicians and surgeons is established by the medical profession itself.

Hamby next claims that the jury instructions were also erroneous for failing to instruct on the Medical Center's independent negligence. This is indeed a troublesome issue. The Medical Center was named as a defendant in this action and was not given a directed verdict, and yet no instruction was given to the jury wherein it might find actionable negligence against the Medical Center. Nevertheless, we find no reversible error.

Hamby contends that the Medical Center's protocol required interstitial monitoring which Dr. Maruyama did not use while performing the hyperthermia procedure.

Hamby contends that it is clear that the Center's own rules and procedures were not enforced, which she claims is sufficient evidence to create a jury issue, citing *Williams v. St. Claire Medical Center*, Ky.App., 657 S.W.2d 590 (1983). In *Williams*, an unqualified, uncertified, and unsupervised nurse negligently administered anesthetic to a patient, which was clearly against the hospital's anesthesiology policies. The key issue was whether a hospital owes a duty to private patients of staff physicians to enforce the published policies and regulations pertaining to patient care, the breach of which might result in independent liability of the hospital. The opinion in *Williams* reads, at 595:

> We believe the record reflects facts which, when taken in light of prevailing case law, create a genuine issue of the hospital's breach of duty to appellant by failing to enforce its own rules and regulations regarding the administering of anesthesia. Therefore, summary judgment on this issue was erroneous.

■ We find *Williams* to be distinguishable in that the unsupervised nurse who negligently administered the anesthesia would have been allowed to administer it according to the hospital policies, had he been under direct supervision from certain qualified staff. The key point is that there was evidence in *Williams* that the acting chairman of the anesthesiology department of the hospital knew both the restrictions imposed on that nurse and that the nurse was unsupervised at the time the incident occurred. The hospital (chairman) had actual knowledge that the policies were being broken but failed to enforce them. Unlike *Williams*, there is no evidence in the case at bar to indicate that the Medical Center had any knowledge that Dr. Maruyama was not proceeding according to its policies. We also note that Dr. Maruyama was the Medical Center's expert and the one who had written the protocol.

We agree with the Medical Center and the trial court that at all times during Glennie Johnson's treatment, Dr. Maruyama and his assistant, Ms. Wills, were *agents* of the Medical Center, acting within the scope of their duty. We have no specific evidence that the Medical Center was guilty of any independent negligence.

Furthermore, and possibly more importantly, the alleged negligence was that the Medical Center failed to enforce its protocol. The jury has already determined that although Dr. Maruyama deviated from the protocol in administering the treatment, such deviation did not cause the injury to Ms. Johnson. This decision would entitle the Center to a directed verdict in the event the case was remanded. The question of the Medical Center's independent negligence is therefore moot. Furthermore, if the medical center was only vicariously liable, as determined by Judge Meade, it would not be liable since its agents were not liable. Reversal is not necessary.

Hamby next argues that she was entitled to a judgment notwithstanding the verdict on the issue of liability. The jury found that Dr. Maruyama deviated from the required standard of care, and yet found that there was no causation between that deviation and the injury complained of. Hamby contends that causation was established as a matter of law. She claims that Dr. Maruyama's deviation from prescribed treatment was prohibited by federal law and therefore if the illegal treatment had not been administered, Ms. Johnson's injury would not have occurred. While this may be true, the evidence was conflicting on all points, and it was sufficient to support the finding by the jury.

Dr. Maruyama did not use the interstitial heat probes because of insufficient flesh in the area subject to treatment. In applying the treatment, Dr. Maruyama first used a bolus bag of deionized water to guide the microwaves between the machine and the area to be treated. To protect Ms. Johnson's ear, the doctor placed a temperature probe between the bolus and the outside surface of the ear and between the inside surface of the ear and the tumor beneath it. Because the tumor was on the skin surface, the probe between the ear and the tumor acted somewhat as an interstitial probe. This method did not succeed in attaining therapeutic temperatures in the

tumor, and Dr. Maruyama switched to a "phantom" bolus which was used to absorb the microwaves and become hot rather than allowing the radiation to pass through the bolus to heat the tissue directly. This concentrated the heat on the surface of the tumor instead of penetrating into the body of it. Ms. Johnson consented to this change in procedure, and the technique did achieve the target temperature for the desired length of time.

Dr. Hornback testified for Dr. Maruyama and the Medical Center that the water bolus treatment and the phantom bolus treatment were well within the required standard of care. Dr. Nussbaum testified for Hamby and disagreed in part with the testimony of Dr. Hornback, but nevertheless essentially agreed that the application during the water bolus phase was proper. There was further proof that interstitial probes were not necessary and that, under the circumstances in this case, it was simply a judgment call as to whether or not to use them. Dr. Nussbaum also admitted that, on occasion, he did not use the deep probes when they could not be successfully used. He further testified that the phantom bolus phase was clearly outside acceptable standards. Dr. Oleson, who also testified for Hamby, indicated that both the water bolus phase and the phantom bolus phase were outside the required standard of care. Dr. Dirksen testified that interstitial probes were never required by the manufacturer, that such deep probes were unnecessary, and that treatment was often administered with surface probes only.

On the question of causation, Dr. Hornback testified that the injury was the result of arterial blockage which had cut off a blood supply to the ear. He testified that, in his opinion, the problem was not caused by heat during either the water bolus phase or the phantom bolus phase. The actual causation was an unforeseen complication and not the result of negligence in the performance of the hyperthermia treatment. Dr. Nussbaum agreed to the extent that the damage was not caused by the water bolus phase. He testified however that, in his opinion, the phantom bolus phase was the cause of the injury in that the external application of heat caused a burn to the ear, resulting in the necrosis. However, Dr. Oleson said just the reverse. He believed that the water bolus phase was the cause of the problem and had a coagulative effect on the ear. He testified that the damage was already done before the phantom bolus phase was used. He further testified that the damage from the water bolus phase was irreversible.

■ The jury could have believed Dr. Oleson that the damage was irreversible and a result of the water bolus phase. The jury could also have believed Drs. Hornback and Nussbaum that everything was within the standard of care on the water bolus phase but outside the standard of care on the phantom bolus phase according to Dr. Nussbaum. The finding could therefore be that Dr. Maruyama deviated in the phantom bolus phase but not in the water bolus phase, and that since the damage was caused by the water bolus phase, if by any treatment, there was no liability. The jury verdict was supported by the evidence.

■ Finally, Hamby contends that Dr. Maruyama judicially "admitted" causation. Dr. Maruyama responded to Hamby's request for admissions as follows:

Defendant, Yosh Maruyama, M.D., ... states in response ... that as a result of the hyperthermia therapy administered to Glennie S. Johnson on April 18, 1983 ... Glennie S. Johnson sustained a burn to her left ear and as a result of that burn, coupled with other conditions from which Ms. Johnson suffered, there was a loss of her left ear.

The Medical Center contends that the response does not admit that the burn or resulting ear loss was the result of a deviation from acceptable standards of care, which was the question facing the jury. Furthermore, no matter what Dr. Maruyama might have said, we note in *Ramsey v. Ramsey*, Ky., 291 S.W.2d 561, 562 (1956), that, "[w]e have held that in determining the conclusiveness of a judicial admission by a party to an action the court should view the admitted fact in the light of all the conditions and circumstances proven in the

case." When viewed in the light of all the circumstances, testimony, and evidence during the trial of this case, we find no error in the trial court's refusal to grant a judgment n.o.v. based on the alleged "judicial admission."

The judgment of the Fayette Circuit Court is affirmed.

All concur.