Lawrence "Pigmeat" NICHOLS, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

Court of Appeals of Kentucky.

Nov. 4, 1966.

Lawrence "Pigmeat" Nichols, pro se.

Robert Matthews, Atty. Gen., Darryl T. Owens, Asst. Atty. Gen., Frankfort, for appellee.

DAVIS, Commissioner.

Lawrence "Pigmeat" Nichols presents numerous grounds upon which he deems himself entitled to a reversal of a judgment imposing punishment of imprison-

190

ment for ten years and a fine of $500 upon his conviction of illegal possession of marijuana. KRS 218.020; 218.210(2). Our view of the case requires discussion of only one of the grounds advanced for reversal—whethe: the contraband narcotic was obtained as the result of an illegal search.

For purposes of testing the legality of the search we relate the evidence most favorable to the prosecution:

About 4:00 p. m. on September 14, 1965, a federal narcotics agent (Albert Cook), in company with Bowling Green police officers, Daryl Moody and Fred Lancaster, posted themselves in an automobile for the purpose of conducting a surveillance of a combination rooming house and beer tavern in Bowling Green. The officers had been on the "stakeout" for only a few minutes when they realized that they had been "made"—that is, persons going in and out of the premises recognized them as officers keeping a lookout. An individual named Freddie Webber saw the officers and ran; they overtook him and inquired as to his identity. He assured them that he would be "vouched for" by appellant, "Pigmeat" Nichols.

Thereupon the three officers, accompanied by Webber, walked into the rooming house which "Pigmeat" managed, and one of them knocked on the door of appellant's room. As Officer Moody related it, the following occurred after his knocking on the door:

"A. And he came to the door and I said: 'You know me don't you, Pigmeat?' And he said: 'Yes, sir, I know you Mr. Moody.' And I introduced Mr. Cook as the Federal Narcotics Agent and I started to introduce Fred Lancaster and he said: 'I know Mr. Lancaster.' And he invited us in at that point. We went inside and we were standing there talking to Mr. Nichols. He was sitting there on the bed and while we were there talking to him Officer Lancaster noticed a con-

tainer with a green substance and he asked Mr. Nichols what it was. Lancaster said: 'What is this, Pigmeat?' [An objection was here overruled] * * * And he said: 'What is this, Pigmeat—marijuana?' And he said: 'Yes, Webber brought it in.' "

After further objections had been overruled, the witness testified:

"And at that point I interrupted them and told them [appellant and Webber] that they didn't have to say anything and that anything they would say could be used against them."

Then it was that both Webber and appellant were arrested on the charge of possession of marijuana.

When Officer Moody was asked why he went into the room he replied that it was to comply with Webber's request to be identified by appellant. The officer flatly stated that he had no reason to suspect that a felony was being committed in the room when he went in.

Officer Lancaster corroborated Officer Moody, and gave this account of his locating the marijuana:

"A. When we got inside the house we were talking to Mr. Nichols and Mr. Webber was in there and Al Cook and myself and Daryl Moody. And I walked over to the side of the bed and I saw a coffee table and I noticed there was a sack laying on the table which was open and I looked inside of the sack and I put my hand down in it and I said: .'Is this what you are looking for,—marijuana?' And Mr. Nichols said: 'Yes, that is what it is but it is not mine. It belongs to Mr. Webber.' "

It is to be observed that Officer Lancaster later explained that he had addressed his question to Federal Agent Cook as to whether "this is what you are looking for?"

There was some loose marijuana in the sack along with some sealed envelopes containing quantities of the drug.

Federal Officer Cook explained the sequence of events in the room:

"A. I believe the sequence would be Lancaster said: 'What is this?' and he stated it was marijuana. And after that I would have looked and I said: 'I believe it is.'"

Admittedly there was no search warrant nor arrest warrant. Appellant did invite the officers into his room, but it is not claimed that he gave any consent for them to search it. The vital, narrow issue is whether there was a "search", or whether the contraband was plainly visible without a "search."

In 79 C.J.S. Searches and Seizures § 1, pp. 775–776 it is written:

"The term 'search,' as applied to searches and seizures, is an examination of a man's house or other buildings or premises, or of his person, with a view to the discovery of contraband or illicit or stolen property, or some evidence of guilt to be used in the prosecution of a criminal action for some crime or offense with which he is charged. As used in this connection the term implies some exploratory investigation, or an invasion and quest, a looking for or seeking out. The quest may be secret, intrusive, or accomplished by force, and it has been held that a search implies some sort of force, either actual or constructive, much or little. A search implies a prying into hidden places for that which is concealed and that the object searched for has been hidden or intentionally put out of the way. While it has been said that ordinarily searching is a function of sight, it is generally held that the mere looking at that which is open to view is not a 'search.'"

The text cited is recognized by virtually all jurisdictions including this one. See Youman v. Commonwealth, 189 Ky. 152, 224 S.W. 860, 13 A.L.R. 1303; Simmons v. Commonwealth, 203 Ky. 621, 262 S.W. 972; Johns v. Commonwealth, Ky., 394 S.W.2d 890.

This jurisdiction has aligned itself frequently with those which recognize that it is not a "search" when an officer observes contraband which is clearly visible, and from a place where the officer has a right to be. See Clark v. Commonwealth, Ky., 388 S.W.2d 622; Childers v. Commonwealth, Ky., 286 S.W.2d 369; and Johnson v. Commonwealth, Ky., 291 S.W.2d 550.

With these tests in mind it remains to determine whether the contraband in the present case was in "plain view" within the meaning of the last cited cases. We concede for this discussion that the officers were lawfully in appellant's room, and thus could view what was "plainly visible." It will be recalled that Officer Lancaster said that the paper bag was open, and that he looked down into it, and placed his hand into it—following which he asked the federal officer whether "this is what [he] was looking for." Significantly, the federal officer explained that after Lancaster had looked and felt in the sack he then looked too, and expressed the view that he "believed" it was what he was looking for. We find it difficult to characterize the contraband marijuana as "plainly visible" in the circumstances at hand. It seems clear that an identification of the material required Lancaster's looking down inside the bag, plus his manual examination of its contents, supplemented by his inquiry of the federal officer—followed by an inspection by the latter.

In 38 Words and Phrases, "Search", p. 401, numerous cases are compiled from many jurisdictions. Without undertaking to cite each case, it is deducible from them that a "search" implies a "prying" into "hidden places" for that which is concealed, as opposed to discovery of that which is "open to view." Other expressions, such as "exploratory investigation," "invasion,"

"quest," "looking for," "seeking out," are used as descriptive and definitive of "search."

Of interest is Walker v. Commonwealth, Ky., 279 S.W.2d 816, in which a somewhat comparable situation was presented. In Walker a sheriff was serving a restraining order, under the terms of which he was directed to padlock all entrances to the building. As observed in the opinion: "It was while the sheriff was checking inside the building to see if anything had been left that might be damaged that he discovered beer in a Coca Cola box, three jars of whiskey in a paper box under the table, one jar in a dresser drawer, and another one-half pint somewhere about the premises." Id., 279 S.W.2d 817. The evidence so obtained was suppressed because obtained by an illegal search, contrary to Section 1C of the Kentucky Constitution.

In Adams v. Commonwealth, 313 Ky. 298, 231 S.W.2d 55, this court suppressed evidence obtained by officers who had been admitted to a disorderly house—and who proceeded to "look around" upstairs. The facts in Adams reveal a more flagrantly illegal search than here, but the principles are quite similar.

The marijuana was not "plainly visible." It came to light after some "prying" into "hidden places," as the result of an "exploratory investigation." It is plain that the marijuana was the object of a "quest" and was what the officers were "looking for" and "seeking out." The fair inference from this record is that Officer Lancaster, even after he had peered into the bag and fingered its contents, needed further information from Federal Agent Cook before he could know that his "quest" was at an end.

The appellee urges that there was no "search," and relies on Wilson v. Commonwealth, Ky., 258 S.W.2d 497, and Clark v. Commonwealth, Ky., 388 S.W.2d 622. In the Wilson case we recognized the principle that contraband which is plainly visible is subject to seizure without a search warrant, because no search is involved. The Wilson opinion points out that it is only when the contraband is "visible, open and obvious to anyone who even casually looks around" that there is no "search." The import of the Clark decision is the same; there the contraband alcoholic beverage was "noticeable to the eye without strain"—it was located on the floor of an automobile, without any wrapping or covering. It is our view that the cited cases, and others of like tenor, merely establish the fact that this court is committed to the general rule which holds that no "search" is involved when the contraband is clearly visible, open and obvious to anyone who even casually observes. But we do not regard the present case as falling within that category.

Adkins v. Commonwealth, 202 Ky. 86, 259 S.W. 32, more nearly approaches the present case than do those just discussed. In Adkins an officer observed the neck of a bottle protruding from a sack in defendant's car; the officer could not see what the bottle contained. The officer directed a fellow officer to obtain the sack, which was done. Examination of the bottle's contents revealed contraband liquor. In Adkins the court recognized the rule which permits seizure of contraband when it is plainly visible, but held that the liquor was not plainly visible within the meaning of that rule. The opinion states, in part: "The evidence of the officers makes it perfectly plain that their ability to testify to appellant's unlawful possession of liquor was due entirely to their search of his automobile, conducted without a warrant, and when, unless disclosed by such search, he was guilty of no offense."

■ We are not unmindful of the unspeakable harm lurking in illicit traffic in drugs, nor are we unaware of the insidious efforts to introduce the nefarious traffic among the youth of our communities. Neither are we callous to the incessant assaults upon society by criminals—organized and unorganized. Yet none of these appealing factors should deter us from enforce-

ment of constitutional guaranties. The problem is not a new one. See Bruner v. Commonwealth, 192 Ky. 386, 233 S.W. 795.

The judgment is reversed with directions to grant appellant a new trial, at which the evidence relating to the discovery and seizure of the marijuana shall be excluded.

HILL, J., dissenting.