James L. CAIN and Clarence L. Morrow, Appellants,

v.

COMMONWEALTH of Kentucky, Appellee.

Supreme Court of Kentucky.

July 29, 1977.

Terrence R. Fitzgerald, Deputy Dist. Defender, Louisville, for appellants.

Robert F. Stephens, Atty. Gen., Mark F. Armstrong, Asst. Atty. Gen., Frankfort, for appellee.

PALMORE, Justice.

At about 3:30 on Saturday afternoon, November 1, 1975, two men held up and robbed a Kroger grocery store at 1318 Berry Boulevard in Louisville. A short time later the appellants, James Leroy Cain and Louis Clarence Morrow, were arrested in an apartment at 1619 Onita * Court, which is in the same general sector of the city. The arresting officers made a search of the apartment and recovered a pistol, a sawed-off shotgun, and the rolls and packages of money that had been taken in the robbery. Both men were indicted for first-degree robbery (KRS 515.020) and for the additional crime of first-degree wanton endangerment (KRS 508.060), the latter charge having resulted from the firing of a gun at a police officer during the chase following the robbery. They were tried together and both were convicted on the robbery count. Morrow was convicted on the wanton endangerment count also. Their sentences were fixed at 20 years each on the robbery charge and five years for Morrow on the wanton endangerment count.

In this appeal Cain and Morrow contend that they were denied a speedy trial as guaranteed by the 6th and 14th Amendments of the United States Constitution.

* Probably "Oneida," but spelled "Onita" throughout the reporter's transcript.

Cf. *Moore v. Arizona*, 414 U.S. 25, 94 S.Ct. 188, 38 L.Ed.2d 183 (1973); *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). They contend also that the items of evidence uncovered by the search should have been suppressed.

The indictment was returned on November 10, 1975, and the appellants were placed under $100,000 bond each. Their subsequent efforts to have the amount of bail reduced were unsuccessful, and they remained under detention until tried. The trial was held on October 13 and 14, 1976.

Because the trial court from which these appeals were taken apparently does not make a practice of entering formal orders setting and resetting trial dates, the record does not provide a very satisfactory history of events pertaining to the speedy-trial issue. There were many pretrial motions and several changes of counsel for the respective appellants. In his motion to dismiss for failure to provide a speedy trial, filed on October 13, 1976, the day of the trial, Cain recited chronological data that are not otherwise supported by the record, but are not controverted either, so we shall assume his narrative to be substantially correct. It says that the first setting was for December 12, 1975, and that he announced ready for trial but on motion of the Commonwealth the trial was reset for March 23, 1976; that on March 23, 1976, he moved for a speedy trial (this is shown in the record), but again at the behest of the Commonwealth the case was passed until April 23, 1976; that the same things happened again on April 23, 1976, and the case was passed to June 9, 1976; and that on June 9, 1976, a further continuance was granted on motion of his codefendant (Morrow), over Cain's objection, whereupon Cain moved unsuccessfully for a dismissal.

On September 9, 1976, Morrow filed a lengthy handwritten motion for dismissal reciting much of the same information contained in Cain's subsequent motion of October 13, 1976, differing only in the description of what happened on December 12, 1975, and June 9, 1976. Morrow's motion says that a pretrial hearing (rather than a trial date) was set for December 12, 1975, whereas Cain says that was the trial date and he was ready for trial. In any event, it seems that Morrow was "out on a court order on December 12, 1975, being in an Indiana jail. A partial transcript of proceedings held on March 23, 1976, indicates that after the Commonwealth had announced not ready by reason of the failure of a witness to appear both Cain and Morrow announced ready for trial, insisted on their right to a speedy trial, and objected to a continuance. Then on April 21, 1976, Morrow notified the trial court by letter that he needed eye surgery, and this must have produced results, because the next pertinent record is an order directing that he be transferred at once from the Louisville General Hospital to the Court House "for trial this date, June 9, 1976." At this time, says Morrow (incorrectly), his own motion for a continuance on account of his eye condition was denied, but then on motion of the Commonwealth, over his objection, the trial was reset for October 13, 1976.

The transcript of proceedings held on June 9, 1976, shows that the Commonwealth and Cain were ready for trial but that after a jury had been partially selected Morrow moved for and was granted a continuance. On this occasion the prosecuting attorney advised the court that he did not wish to try Cain and Morrow separately, because he had prepared his case on the basis of their being tried together. The trial court was faced with a motion by Morrow for a continuance and a motion by Cain for an immediate trial. Counsel for Cain stated that he would have no objection to a continuance if the amount of bond were reduced, but the trial court, having already conducted two hearings on motions for a reduction in the amount of bond, again declined to reduce it. It appears from the June 9 colloquy among court and counsel that September 13, 1976, was the earliest open date for which the trial could be rescheduled, and it was tentatively set for that time. The circumstances under which it was further deferred until October 13, 1976, are not reflected by the record.

To summarize the essential facts, these men were arrested on November 1 and indicted on November 10, 1975. On December 12, 1975, their trial was set for March 23, 1976. At that time, however, a continuance was granted because a witness for the Commonwealth was absent. The trial was reset for June 9, 1976, but on the latter date Morrow insisted on a continuance (presumably upon good cause), and because the Commonwealth, which was ready for trial, had not prepared for a severance the court continued the case as to both defendants. It was finally tried on October 13, 1976.

We descry in this record nothing to suggest any purpose on the part of the Commonwealth to stall off a trial, nor any indication of actual prejudice to the defense of Cain and Morrow, each of whom presented a fantastic story without attempting to corroborate any part of it by other witnesses who were in a position to know the circumstances leading up to their fortuitous arrival at the vicinity of the robbery just in the nick of time to be incriminated in it. On June 9, 1976, which certainly was within a reasonable time for the trial to be held, the continuance was initiated by Morrow, and Cain's only objection to it was that he could not meet the required amount of bail. We recognize, as pointed out in *Barker v. Wingo*, 407 U.S. 514, 532, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), that the prejudice to a defendant from delay in being brought to trial includes the mental and physical anguish of jailhouse incarceration, and is not confined to possible impairment of his defenses. We therefore must and do take that regrettable condition into account in determining "how long is too long in a system where justice is supposed to be swift but deliberate." *Id.*, at 407 U.S. 521, 92 S.Ct. 2187.

Though Cain and Morrow were diligent in asserting the right to a speedy trial, and endured the oppression of languishing in jail for over 11 months awaiting it, under the balancing test prescribed in *Barker v. Wingo*, 407 U.S. 514, 530 et seq., 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), we reach the conclusion that in view of the causes for the delay its length was not so unreasonable as to violate the constitutional rights of either.

The matter of the search presents a more difficult problem, and among other things the Commonwealth contends that even if it was invalid the other evidence of guilt was so overwhelming that the error in admitting the fruits of the search was not prejudicial. This requires us to summarize the evidence.

Morrow is short and dark and Cain is taller and lighter. The robbery was perpetrated by two black men, one short and dark and the other taller and lighter. They arrived and left in a brown Pontiac automobile owned by William R. Hayes, a witness whose role in the case will be discussed below. The taller man pointed a pistol at Eva Thorpe in the office and took the money while the short man held a shotgun on the rest of the people in the store. Mrs. Thorpe saw the tall man's face, but she could not thereafter identify him.

Martha Stovall, one of the customers in the store, testified that she got a good look at the man with the shotgun, and at the trial she positively identified Morrow as that man. She said also that she had made an identification in a police lineup that night, but an officer who assisted in conducting the lineup testified that although Morrow was in the lineup Mrs. Stovall picked out a man named Hayes.

Rickie Mills, a Kroger employe, saw a brown Pontiac drive up to the store at 10:30 or 11:00 in the morning of November 1 while a Brink's man was delivering a supply of money. The car was occupied by two men, one of whom entered the store and looked the place over. Mills identified Cain as this man. While the robbery was in progress that afternoon Mills slipped out the back door of the store building and saw what appeared to be the same brown automobile in the parking lot, so he took its license number. There was "a man slumped down in the seat," but Mills "couldn't tell exactly who it was." That night at a police lineup he recognized Cain's face but had some doubt because his size

and build seemed different from those of the man he had observed in the store that morning.

Officers Joseph Knipp and James Brown were on duty in a patrol car three or four blocks away from the Kroger store when they received a radio report of the robbery. They proceeded at once to the scene and then heard another report to the effect that the culprits (described according to Knipp as three, and according to Brown as two, black males) had been seen on or near the Watterson Expressway. The officers drove to the south side of the expressway, parked their automobile, climbed the fence and went across to the other side. Brown crossed the fence along the north side of the expressway and went into a wooded field behind Nichols Hospital while Knipp ran along the inside of the fence. Knipp heard two shots fired and saw one black person running. He returned to the patrol car and reported the incident by radio. Meanwhile, after going into the field Brown encountered two black men at a distance of about 50 yards. The shorter one of the two fired a shotgun at him, and after firing one return shot with his pistol Brown dropped to the ground for protection. (Neither shot found its mark.) The two fugitives disappeared into a drainage ditch leading under the expressway to the rear of the apartments on Onita Court. At the trial Officer Brown positively identified Cain and Morrow as the men he had encountered and Morrow as the one who had fired the shotgun in his direction.

Sgt. Jack King, a detective on the Louisville police force, was on duty in his car near the scene of the robbery when he heard a radio message to be on the alert for two black males in a brown Pontiac automobile with the license number given by Mills and by another Kroger employe. He discovered the automobile stopped near Onita Court and saw two black men running northward from it toward the Watterson Expressway, which they crossed after climbing a fence. He returned to the automobile, and a short time later a person he knew but did not identify at the trial came up and reported that the people who had run from the automobile had gone into building No. 9 at the north end of Onita Court. Sgt. King thereupon radioed for help and a few minutes later he was joined by a large group of police officers. They closed in on the apartment at 1619 Onita Court and called for the occupants to come out. In due course Morrow came to the door in his underwear, whereupon the officers entered, took Morrow, Cain, and "another black male" whose name Sgt. King could not recall into custody, and searched the apartment. They found the money hidden in the lower part of the refrigerator. The shotgun (from which the stock had been removed) was discovered in the back of an overstuffed chair, which had been split open to allow the gun to be slipped inside the covering. It is not clear from the evidence just where the pistol was found, but we presume it was with the money in the bottom of the refrigerator. It is conceded that none of these items was in "plain view," and there was, of course, no warrant for the search.

This brings us to the testimony of the most equivocal witness, yet the key witness, in the case, a man named William Hayes, whose brown Pontiac automobile was used in the robbery. Both Hayes and his son Robert were joined with Cain and Morrow as indictees on the robbery count. Robert was not called as a witness by either side, and the transcript reflects what appears to be almost a concerted effort by the prosecution and defense alike to avoid revealing his role in this bizarre event. Whether he was the driver who waited in the car while the other two men held up the store, was the third man apprehended in the apartment at 1619 Onita Court, or was the helpful informant who told Sgt. King that the fugitives were to be found there we do not know. In any event, when the case was called for trial on June 9, 1976, the Commonwealth succeeded in settling with William and Robert Hayes for guilty pleas on reduced charges. It was brought out on cross-examination of William Hayes that he had pleaded guilty to a charge of criminal facilitation (KRS 506.080) with the under-

standing that the Commonwealth would recommend probation of his sentence, but upon objection of the prosecuting attorney defense counsel were not permitted to question him with respect to the disposition of Robert's case.

William Hayes testified that he had known Morrow for some time but had never seen Cain before November 1, 1975. He first saw Morrow that morning at 1821 Coral Court, where Robert lived with his mother and a girl-friend. He was not asked and did not say how or when he met Cain, but testified that later in the morning Cain and Morrow were with him at 1619 Onita Court. He explained that 1619 Onita Court was his girl-friend's apartment and that he lived there. At another point in his testimony he said that his residence on November 1, 1975, was at 5311 Rangeland Road, so presumably he spent time at both places. Why Cain and Morrow happened to be with him at 1619 Onita Court that morning, and when they left, is unexplained. The story resurfaces in the middle of the afternoon, just before the robbery at 3:30 P. M. At this time, said Hayes, the three of them had been together in his automobile for about an hour, before which he had met Cain and Morrow at 1619 Onita Court. Hayes stopped the car in the Kroger parking lot, left the motor running, and went to a nearby service station to buy some cigarettes. When he returned, the automobile was gone and he did not see Cain or Morrow again until after they had been arrested. He reported his automobile as stolen.

Sgt. Jack King, whose testimony has been mentioned before, took a statement from William Hayes the day after the robbery and said that Hayes told him he knew in advance that his car was going to be used in the robbery and that his son was present in the apartment at 1619 Onita Court but did not have anything to do with it. Hayes, who testified prior to King's appearance as a witness, admitted making a statement but denied having known in advance that Cain and Morrow were going to rob the Kroger store or use his automobile for that purpose, and also denied having said that his son had been among the group at 1619 Onita Court.

He did concede that he had said Morrow told him "there would be a piece of money in it for me," explaining that Morrow had owed him $25.00 for four years or so. He was not asked what he meant by "in it," but he emphatically denied having known about the robbery. Nor was he asked whether, when he left 1619 Onita Court with Cain and Morrow, there was any understanding as to where they were going or whether they contemplated returning to the apartment.

Cain testified that he had never been in Louisville before. He had left his home in Chicago at about 9:00 in the morning of November 1, 1975, and was driving to New Orleans to pick up his wife. He was tired and drowsy and turned off Interstate 65 westward onto the Watterson Expressway in search of a restaurant. As fate would have it, he chose a small shopping center in the vicinity of Taylor and Berry Boulevards and found a restaurant there. After consuming some coffee he stopped for gasoline at a service station near a Kroger store. While he was there he noticed a commotion at the store, with policemen going in and out. Meanwhile, he had become confused with respect to the route by which he could get back to I-65 and got some directions from the service station attendant. Then he went into Kroger's and bought some cookies. When he returned to his car, there stood this kind stranger Mr. Hayes, whom Cain asked to give him some better directions to I-65 than he had received from the service station attendant. The directions given him by both of these people seemed complicated, however, so he offered to pay Hayes to lead him to the proper ramp. But lo and behold, Hayes' car had just been stolen, and he was waiting for his son to come and pick him up. Hayes accepted Cain's offer to drive him over to the son's place, but when they got there the son's car would not start. Hayes said he had just bought the battery that morning and would have to go and exchange it. Meanwhile, observing that Cain was too sleepy to continue his trip to New Orleans right away, Hayes suggested that he could

rest in the apartment of Hayes' girl-friend, who was over at Hayes' other place and was not at home. When they arrived at 1619 Onita Court they found Morrow asleep in one bedroom, and Cain lay down in another room, where he was sleeping when the officers arrived.

Morrow, who described himself as Dr. Louis Clarence Morrow, was a resident of Indianapolis, where he and his wife operated a restaurant or dining club and he engaged in educational work as well. Somewhere along the line he had been convicted of an embezzlement felony. On November 1, 1975, he had closed his business at a wee hour in the morning and left at about 5:00 A. M. to attend some business in Louisville about an automobile he had bought which had been confiscated by the F.B.I. as a stolen vehicle. Unlike Cain, Morrow was familiar with Louisville and had acquaintances there. He went down 18th street to a restaurant where he knew that the fellow who had sold him the car with the dubious title customarily hung out, but upon his arrival he was informed that this man generally didn't show up until later in the day. So, having time on his hands Morrow began telephoning some of the people he knew, and in this manner got in touch with his old friend William Hayes. When Hayes found out Morrow was in town he insisted on coming right over to see him. After they talked and Morrow had explained the occasion for his being in Louisville, Hayes suggested that Morrow go with him to pick up his girl-friend's check. Morrow at first demurred on the ground that he was tired and needed some rest, but Hayes had just the ticket for that ailment. Morrow could rest and relax at this very place where Hayes was going to get the check—1619 Onita Court! You can guess the rest.

The contention of Cain and Morrow that they were denied a fair hearing in chambers on their motion to suppress the fruits of the search needs no discussion, because the Commonwealth defends the evidence solely on the basis that they had no standing to challenge the search. It is the Commonwealth's theory that Cain and Morrow were not legitimately on the premises at

1619 Onita Court and had no reasonable expectation of privacy or freedom from governmental interference. We are not so sure of that.

Hayes' statement that the apartment belonged to his girl-friend and that he was living there was not contradicted. If it is true that when Cain and Morrow were apprehended they were in the apartment at the invitation of Hayes, we think that under the rationale of *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), and *Butler v. Commonwealth,* 536 S.W.2d 139 (Ky.1976), they were lawfully on the premises and had standing to challenge the search. This particular factual issue, however, was never presented to or resolved by the trial court, and if these appeals were to stand or fall on that question it would be necessary for us to remand the proceeding to the trial court to conduct a hearing and make findings of fact in that respect.

Actually, it is our own viewpoint that under the exigencies of the case the warrantless search was perfectly reasonable and ought to be sustained regardless of whether Cain and Morrow had standing to contest its validity, but we are not at all confident that this position would be favorably received in terms of contemporary federal precedents, and even some of our own that owe their existence to the necessity of compliance with higher authority. So we assume for purposes of the argument, as apparently the Commonwealth does also, that if Cain and Morrow had standing to challenge it the search cannot be upheld as constitutionally reasonable. Cf. *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1972); *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); *Harris v. Commonwealth,* Ky., 469 S.W.2d 68 (1971); *Nichols v. Commonwealth,* Ky., 408 S.W.2d 189 (1966).

■ On the other hand, incriminating as that evidence was, a careful study of the other testimony in the case convinces us that even without it a conviction would have been virtually inevitable. The in-

court identifications provided by Mrs. Stovall and Rickie Mills suffer to some extent from their earlier reactions at the police lineup, but they gain much corroborative authenticity from the unwavering identification given by Officer Brown. And whatever may have been the role of William Hayes in the affair, or the deficiencies in his testimony, the unavoidable impression left by the evidence is that if he had told more it probably would have been worse, not only for him but for Cain and Morrow. Perhaps, indeed, that would explain why he seems to have been cross-examined with kid gloves. In summary, Cain is identified at the store in the morning and Morrow in the afternoon. The automobile used by the robbers is identified beyond quibble or question. Hayes puts them in the car. Both are identified during the chase by a police officer. The empty car is found near Onita Court. They are found in 1619. If they are telling the truth, Hayes is lying and all three of the other identifying witnesses are mistaken. Their stories, especially Cain's, rival Grimm's Fairy Tales and are utterly uncorroborated. In terms of the *Harrington-Chapman* criterion we are of the opinion beyond a reasonable doubt that the admission of the items turned up by the search was, if erroneous, harmless error. Cf. *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1966).

The one other point made by Cain and Morrow was not preserved for review. When the trial court would not permit counsel to cross-examine William Hayes on the subject of what kind of a deal had been made with the Commonwealth in his son Robert's case, the proper procedure was to move that the examination be conducted by way of avowal outside the hearing of the jury. Cf. RCr 9.52. The inquiry was, of course, admissible to discover possible bias on the part of the witness, and the trial court erred in disallowing it, but without an avowal to show what a witness would have said an appellate court has no basis for determining whether an error in excluding his proffered testimony was prejudicial.

The judgment is affirmed.

REED, C. J., and CLAYTON, PALMORE, STEPHENSON and STERNBERG, JJ., sitting.

All concur.