Michael J. BAYLESS, II; Michael J. Bayless; and Deborah Bayless, Appellants

v.

Robert L. BOYER, M.D.; and Walter Eiseman, M.D., Appellees.

No. 2003–SC–0250–DG.

Supreme Court of Kentucky.

Dec. 22, 2005.

John H. Metz, Kenneth J. Koenig, Cincinnati, OH, Counsel for Appellants.

Frank V. Benton, Benton, Benton & Luedeke, East Row Historic District, Newport, Counsel for Appellee, Robert L. Boyer, M.D.

Arnold S. Taylor, O'Hara, Ruberg, Taylor, Sloan & Sergent, David A. Futscher, Covington, Counsel for Appellee, Walter Eiseman, M.D.

ROACH, Justice.

## I. INTRODUCTION

This appeal arises from Appellants' allegation of medical malpractice against Robert L. Boyer, M.D. and Walter Eiseman, M.D., for failing to diagnose a wrist fracture. At trial, Appellants, Michael J. Bayless, II, and his parents, Michael J. and Deborah Bayless, were awarded damages for medical bills but no damages for pain and suffering. They appeal the decision of the Court of Appeals affirming the denial of their motion for a new trial in the Kenton Circuit Court. Appellants allege that numerous errors occurred, the cumulative effect of which entitles them to a new trial. Primarily, they claim: (1) that the jury's "zero" verdict for pain and suffering damages was inappropriate; and (2) that limitations on the scope of questioning allowed by the trial court, particularly as related to the alleged bias of witnesses, were improper. In addition to their two central claims, Appellants raise several additional issues which we discuss below. Having reviewed each of Appellants' claims of error, we conclude they are without merit. Thus we affirm the Court of Appeals.

## II. BACKGROUND

Michael Bayless, II, fractured his right wrist while playing with friends on March

12, 1995. Later that night, his wrist became swollen and painful, so his mother took him to the emergency room of St. Elizabeth Medical Center ("Medical Center").[1]

The triage nurse at the emergency room ordered an x-ray of Michael's wrist. Dr. Robert L. Boyer examined Michael. Dr. Boyer's notes of this examination included the entry "no wrist pain." Deborah Bayless's testimony suggested that, in addition to his physical examination of Michael, Dr. Boyer had also examined x-rays of the boy's wrist. Although Dr. Boyer did not remember any details of their meeting, he testified that because Michael had not complained of any acute pain during his brief examination, he thought it was unlikely that he would have reviewed the wrist x-rays. Dr. Boyer failed to diagnose the fracture and concluded instead that Michael had only a sprained wrist. He instructed Michael to wrap the injured wrist with an elastic bandage, apply ice, and take ibuprofen for pain. Pre-printed instructions on Michael's discharge paperwork stated, "IF YOUR CONDITION WORSENS OR RETURNS, PLEASE CALL OR SEE YOUR PHYSICIAN OR RETURN TO THE EMERGENCY DEPARTMENT."

The next day, Dr. Walter Eiseman, a radiologist under contract with the Medical Center, examined the x-ray of Michael's wrist. He too failed to recognize the fracture. At trial, Dr. Eiseman stipulated that he had violated the standard of care applicable to him in failing to diagnose Michael's broken wrist, but he argued that his failure to detect the fracture had not been a substantial factor contributing to Michael's injury.

After his discharge from the hospital, Michael continued to lead a very active lifestyle as a member of his high school's freshman baseball team. During this time, he claimed that he also experienced chronic pain in his wrist, routinely icing his arm and taking over the counter medications in an effort to relieve his symptoms. Despite his claim of constant pain, neither Michael nor his parents sought follow-up medical treatment until two months after his visit to the emergency room. Michael finally learned that he had a fractured wrist during a visit to his pediatrician. Although Michael testified at trial that the injury was not discovered until after the baseball season ended, this testimony was impeached by his prior deposition testimony which indicated that he had actually learned of the injury shortly before the end of the season and had continued to play.

After the season, Dr. John Wyrick, an orthopedic surgeon, evaluated and treated Michael's fractured wrist. Because of the delay in diagnosis, movement and calcification of the fractured bone made treatment by casting the wrist impossible. Dr. Wyrick subsequently performed surgery to repair the fractured bone. He testified that he had great confidence that the surgery was successful, that Michael would have normal strength in the wrist, and that the surgery had not rendered Michael any more susceptible to chronic pain or arthritis—in short, Michael's surgical treatment was no less successful than had his wrist been treated promptly by casting.

At trial, the jury found no liability on the part of Dr. Boyer for his care and treatment of Michael. However, the jury concluded that Dr. Eiseman was liable for his negligence in Michael's treatment.

---

1. The Medical Center was named as a defendant in the original lawsuit, but the jury did not find against it. Appellants declined to pursue an appeal as to this portion of the jury's verdict, exonerating the Medical Center of any liability.

The jury also found that Michael and his parents failed to exercise ordinary care for Michael's safety and health, and apportioned liability between Dr. Eiseman and Appellants equally. The jury found damages of $9,802.16 based on the amount of his medical expenses, primarily the costs of the surgical procedure, but the jury declined to award any damages for Michael's pain and suffering. The final judgment of the trial court against Dr. Eiseman was $4,901.08.

The trial court denied Appellants' motion for a new trial, and the Court of Appeals affirmed on direct appeal. We granted discretionary review.

### III. ANALYSIS

As noted above, Appellants allege numerous trial errors. The two primary issues—the appropriateness of the jury's "zero" verdict for pain and suffering and the trial court's restriction as to the scope of witness questioning—demand the greatest attention and will be discussed first.

### A. "Zero" Verdict for Pain and Suffering

Appellants claim it was error for the trial court to deny their motion for a new trial on the issue of damages for pain and suffering. Appellants' motion, pursuant to CR 59.01(d), specifically challenged the validity of the jury's verdict of zero damages for Michael's pain and suffering. Appellants claim that uncontroverted evidence of Michael's pain from the surgery entitled them to an award for these damages. In response, Appellees argue that Appellants' evidence was inconclusive and that the jury verdict was justified by testimony at trial.

It is well-established that appellate courts in this state review trial court rulings on a motion for new trial on grounds of inadequate damages under a "clearly erroneous" standard of review. *See, e.g., Cooper v. Fultz*, 812 S.W.2d 497 (Ky.1991). "Our decision in *Cooper* amounts to a recognition that a proper ruling on a motion for new trial depends to a great extent upon factors which may not readily appear in an appellate record. Only if the appellate court concludes that the trial court's order was *clearly erroneous* may it reverse." *Turfway Park Racing Ass'n v. Griffin*, 834 S.W.2d 667, 669 (Ky.1992) (emphasis added). Accordingly, we treat the decision of a trial court on this issue with a great deal of deference.

In addition, we recently rejected the notion that a jury verdict of zero for pain and suffering is inadequate as a matter of law in cases where a jury also awards damages for medical expenses. In *Miller v. Swift*, 42 S.W.3d 599 (Ky.2001), we held, "[t]he law in Kentucky ... does not require a jury to award damages for pain and suffering in every case in which it awards medical expenses." *Id.* at 601. Relying heavily on *Turfway Park*, we reiterated that "[o]ur review ... is limited to whether the trial court's denial of [the motion for retrial] was clearly erroneous." *Id.* Although not specifically argued in this case, we must also note that the general principle advanced in *Miller*—that a zero verdict for pain and suffering may sometimes be appropriate—is not constrained to the facts of that case.[2] Rather, that

---

2. In *Miller,* the plaintiff suffered from a variety of chronic illnesses prior to the accident. The basis of her claim for pain and suffering damages was that the pain from these conditions had been exacerbated by her injuries and had increased in the wake of the acci-

dent. We noted that the trial judge's decision denying retrial on the issue of damages was appropriate "[b]ecause the evidence at trial supported a finding by the jury that Miller did not suffer additional pain as a result of the accident...." *Miller,* 42 S.W.3d at 599.

principle is broadly applicable to cases which claim this type of error. We note this only to confirm that our holding here reaffirms and does not expand or alter the principle set forth in *Miller*.

Appellants claim that had Michael been properly diagnosed, his fractured wrist could have been treated with a cast and would not have required surgery. They argue that because this fact was uncontroverted at trial and because the surgical procedure was necessarily painful, the judge's denial of their motion for a new trial was clearly erroneous.

Appellants cite *Hazelwood v. Beauchamp*, 766 S.W.2d 439 (Ky.App.1989), in support of this contention. In that case the Court of Appeals stated: "While it is true that the jury did not have to believe [the plaintiff's] testimony regarding the pain he claims to have endured, it was not free to disregard the uncontroverted evidence of the nature of the accident itself and the medical procedures performed." *Id.* at 441. We would first point out that because *Hazelwood* is a case from the Court of Appeals, it is not binding on this Court. But the facts in *Hazelwood* are also markedly different from the facts in this case. In *Hazelwood*, the plaintiff sued his employer and a coworker after having his hand maimed in a mechanical hay bailer that he was attempting to repair. The jury concluded that his injury was, at least in part, the result of his coworker's negligence. Nevertheless, they awarded only nominal damages for pain and suffering. In contrast, Appellants in this case sued on a theory of medical malpractice; damages were not based directly on a physical injury, but resulted from a delay in the diagnosis and treatment of Michael's broken wrist. The nature of any pain and suffering damages that Michael could have rightfully claimed is fundamentally different than that discussed in *Hazelwood*.

Additionally, despite Appellants' claim that the evidence of Michael's pain and suffering was uncontroverted, there were numerous instances where relevant testimony on the subject was either impeached or contradicted. In fact, we note substantial problems in three key areas of Appellants' proof of pain and suffering: (1) Michael's deposition and trial testimony, (2) Dr. Wyrick's testimony, and (3) Michael's medical records describing the surgical procedure and follow-up treatments.

First, Michael's claim that he constantly suffered pain after the surgery was not corroborated by Dr. Wyrick's notes describing Michael's follow-up appointments. Remarkably, the notes, which detail several separate visits, do not include any indication that Michael was experiencing pain until *after* this lawsuit was initiated. In addition, Dr. Wyrick's notes directly *contradicted* Michael's testimony on this point, since they expressly observed that Michael "denie[d] any pain at all" on one occasion and was "having no pain" on another. Second, although Michael claimed that the pain in his arm following surgery prevented the normal use of this hand during his day-to-day activities, he admitted under cross examination that he had fully participated in two baseball seasons after the surgery. This fact was substantially confirmed in his medical records, which noted he had been playing baseball and could do pushups without any significant problems. Third, Dr. Wyrick testified that there would likely have been significant pain associated with treatment of Michael's fractured wrist regardless of the treatment option, either casting or surgery, that was used. He further testified that he could not predict any significant difference in pain between the two options. Finally, Michael's surgery was performed under general anesthesia, preventing or limiting the acute pain directly related to the pro-

cedure. There was substantial evidence for the jury to conclude that Appellants were not entitled to a damages award for pain and suffering.

## B. Scope of Cross–Examination

Appellants claim their due process rights were violated by the trial court's decision to limit the scope of cross-examination of witnesses as to possible bias and prejudice. Specifically they claim that they should have been freely permitted to ask questions relating (1) to the compensation of expert witnesses and (2) to whether there was any commonality between the insurance carriers of those experts and the Appellees. We address these claims individually.

### 1. Cross–Examination as to Compensation

■ This issue was not even addressed, much less preserved by objection, at trial. Appellants admit that they did not raise the issue of expert compensation and justify this failure because, at the time of trial, Kentucky courts were not generally required to allow such questioning. *See Current v. Columbia Gas of Kentucky, Inc.,* 383 S.W.2d 139 (Ky.1964) (holding that although it was a matter within the trial court's discretion, admission of testimony disclosing specific details of witness compensation was not generally favored). *Current* was overruled by this Court in *Tuttle v. Perry,* 82 S.W.3d 920 (Ky.2002), which was decided during the pendency of this appeal. In *Tuttle,* which reversed a defense judgment in a medical malpractice trial, we held that "the amount of money a witness is paid for testifying in a particular case is unquestionably disclosable on cross-examination.... To the extent *Current v. Columbia Gas of Kentucky* is to the

contrary, it is overruled." *Id.* at 923 (citing *Wrobleski v. Nora de Lara,* 353 Md. 509, 727 A.2d 930 (1999)).

Despite their failure to preserve or even address the issue at trial, Appellants ask that we reverse the judgment in this case on the authority of *Mitchell v. Hadl,* 816 S.W.2d 183 (Ky.1991) ("When the facts reveal a fundamental basis for decision not presented by the parties, it is our duty to address the issue to avoid a misleading application of the law."). This we will not do. The Appellants' reliance on *Mitchell,* wherein the Court decided the case on a unique legal theory that was not addressed by any party, is clearly misplaced. Appellants do not, indeed cannot, claim that the trial court took any action preventing them from raising the issue of expert witness compensation. More importantly, however, *Current* only discouraged the introduction of testimony as to expert witness compensation; the decision to admit such testimony was still ultimately left to the discretion of a trial court. Had Appellants wished to introduce the testimony, they could, and should, have raised the issue at trial. As such, there is no doubt that Appellants' decision to forego the issue was unquestionably their own. Such a mistake in judgment, even one that is arguably understandable, provides no basis for reversal.

### 2. Cross–Examination as to Commonality of Insurance Providers

■ In contrast to their failure to address the compensation of defense experts, Appellants did make some attempt to raise the issue of commonality between the malpractice insurance carriers of the defense witnesses and the defendants as a source of potential bias.[3] This issue has previous-

---

3. Boyer named two expert witnesses, Bruce D. Janiak, M.D. and James L. Evans, M.D. Dr.

ly been addressed only by the Court of Appeals. In *Wallace v. Leedhanachoke,* 949 S.W.2d 624 (Ky.App.1996), the Court of Appeals held that "the [trial court] was required to balance the probative value of the evidence [of commonality between insurance carriers] ... against the prejudicial effect it may have produced before it permitted the cross-examination proposed by the plaintiffs." *Id.* at 628. The Court of Appeals went on to note:

> The mere fact that the two physicians shared a common insurance carrier— absent a more compelling degree of connection—does not clearly evince bias by the expert, and its arguable relevance or probative value is insufficient to outweigh the well-established rule as to the inadmissibility of evidence as to the existence of insurance.

*Id.* We agree with the Court of Appeals. Its holding in *Wallace* is a sound application of the balancing test required by KRE 403 as applied to the specific issue of commonality of insurance carriers.

■ During Appellants' cross-examination of Dr. Boyer, the trial court summarily refused to allow this proposed line of questioning without engaging in the balancing test described in *Wallace.* The trial court's refusal even to consider admission of this testimony might constitute error if it could be shown to be prejudicial. However, we cannot undertake such analysis because there is no evidence in the record, even by avowal, of commonality of insurance carriers. Appellants' attorney stated he would proffer evidence as to commonality of malpractice providers later in the trial, but this never occurred. Having been denied the opportunity to cross-examine Dr. Boyer on this issue, it was incumbent upon Appellants'

counsel to at least make an avowal in order to ensure the issue could be adequately reviewed on appeal. "[W]ithout an avowal to show what a witness would have said an appellate court has no basis for determining whether an error in excluding his proffered testimony was prejudicial." *Cain v. Commonwealth,* 554 S.W.2d 369 (Ky.1977). In this case, it is not enough that Appellants have identified the issue because their failure to proffer any evidence of commonality, much less any improper motive or bias on behalf of those testifying, precludes any finding of prejudice.

## C. Miscellaneous Allegations of Error

Appellants also claim that (1) the trial court erred by finding that the Appellees were adverse parties and thereby granting them *each* three peremptory challenges; (2) the trial court improperly denied Appellants' claim of loss of consortium; (3) Appellees and/or their counsel engaged in misconduct; (4) the jury instructions erroneously directed the jury to consider Appellants' comparative negligence; (5) the jury instructions failed to properly instruct the jury as to the applicable law; (6) the jury's verdict as to Dr. Boyer's liability was not supported by the evidence; and (7) the jury engaged in misconduct. We address each of these issues in turn.

### 1. Peremptory Challenges

■ Appellants claim that it was error for the trial court to allow Dr. Eiseman and Dr. Boyer three peremptory challenges each during the jury selection process in violation of CR 47.03. The rule states, in relevant part: "In civil cases each opposing side shall have three per-

---

Evans was unable to testify at the trial due to a scheduling conflict, however Dr. Janiak did testify before the court. Dr. Eiseman did not call any expert witnesses to testify on his behalf.

emptory challenges, but co-parties having antagonistic interests shall have three peremptory challenges each." CR 47.03(1). The thrust of Appellants' argument is that Dr. Boyer and Dr. Eiseman were not sufficiently antagonistic to entitle them to separate peremptory challenges.

The trial court must consider several factors in allocating the appropriate number of peremptory strikes under CR 47.03. In a recent unanimous opinion, we held:

> Generally, there are three elements to be considered in determining if coparties have antagonistic interests. They are 1) whether the coparties are charged with separate acts of negligence; 2) whether they share a common theory of the case; and 3) whether they have filed cross-claims. Additional important factors are whether the defendants are represented by separate counsel; whether the alleged acts of negligence occurred at different times; whether the defendants have individual theories of defense; and whether fault will be subject to apportionment. All of these factors are to be weighed by the trial court in determining if the defendants have antagonistic interests and thus are entitled to separate peremptory challenges.

*Sommerkamp v. Linton,* 114 S.W.3d 811, 815 (Ky.2003) (internal citations omitted). We further stated:

> [I]nterests that are antagonistic at the time of jury selection or when the trial judge makes a determination regarding entitlement to separate peremptory challenges, do not necessarily have to remain antagonistic throughout the trial in order to support the allocation of separate challenges. There can be no certainty as to what the evidence will demonstrate or precisely what the claims or defenses will be during trial.

*Id.* at 816.

▪ Appellants have provided no specific rationale for reversing the trial court

on this issue and rely instead on a general objection that the Appellees pursued a common defense strategy throughout the trial. Appellees have each noted several instances during the trial which demonstrated their antagonistic interests. That being said, there is no need to recount each of those instances here. As noted above, a trial court's ruling under CR 47.03 is necessarily made prior to trial and a review of that decision need not focus on what actually occurred during the proceedings.

In *Roberts v. Taylor,* 339 S.W.2d 653 (Ky.1960), a decision discussing an earlier version of the peremptory challenge rule, our predecessor court stated: "Where the defendants in a personal injury action are charged with independent acts of negligence ... the interests of the defendants are most always antagonistic, because each may escape liability or reduce his liability by convincing the jury that the other was solely or primarily responsible." *Id.* at 656. In this case, where two physicians were alleged to have committed entirely separate acts of negligence, that statement alone provides sufficient justification for the trial court's decision. This is particularly true given the jury's ability to consider the comparative negligence of the parties. We cannot say that the trial court abused its discretion in granting separate peremptory challenges to the defending parties.

## 2. Denial of Appellants' Loss of Consortium Claim

▪ Appellants claim the trial court improperly refused to instruct the jury on their claim of loss of consortium. We first note that the only statutory support we can find for such a claim is limited to cases involving the wrongful death of a minor. *See* KRS 411.135 ("In a wrongful death

action in which the decedent was a minor child, the surviving parent, or parents, may recover for loss of affection and companionship that would have been derived from such child during its minority, in addition to all other elements of the damage usually recoverable in a wrongful death action."). It suffices to say that Michael Bayless was not killed.

Appellants cite *Department of Education v. Blevins,* 707 S.W.2d 782 (Ky. 1986), for the general proposition that a parent may bring a claim for loss of consortium. But the cause of action in *Blevins* was premised on KRS 411.135 and loss of consortium damages were alleged after the death of a child. Nothing in *Blevins* supports the expansion of loss of consortium claims beyond the extreme case of a wrongful death lawsuit. Even if it did, we would point out that the holding in *Blevins* is limited to the context in which it arose, namely as an action against a state entity, and not an individual tortfeasor, pursuant to the Commonwealth's Board of Claims Act.[4] Furthermore, *Blevins*'s allowance for parental loss of consortium claims under the act was abrogated by statute as recognized in *Williams v. Kentucky Department of Education,* 113 S.W.3d 145, 156 (Ky.2003).

Appellants provide no binding authority suggesting that Kentucky law recognizes a cause of action for loss of parental consortium in a personal injury case such as this. Instead Appellants cite an opinion of the Ohio Court of Appeals, *Rouse v. Riverside Methodist Hosp.,* 9 Ohio App.3d 206, 9 O.B.R. 355, 459 N.E.2d 593, 600 (1983), which they claim as proof that "other courts have recognized and protected the right of a parent to be compensated for the interruption of parental rights." But Appellants' assertion about *Rouse* is clearly false. In fact, *Rouse* does not address the

loss of consortium issue at all; rather it merely "allow[s] a parent to recover from the wrongdoer the reasonable value of the care or attendance which he himself renders to his child as the result of a negligent injury." *Id.* at 600.

Having cited no primary or secondary authority supporting their position, Appellants give us little reason to depart from the holding of the Court of Appeals in *Humana of Kentucky, Inc. v. McKee,* 834 S.W.2d 711 (Ky.App.1992). In that case, despite proof of serious and permanent injury to a child, the Court of Appeals upheld the trial court's denial of an instruction on "the loss of [the child's] companionship, love and affection," that is, a claim for parental loss of consortium. *Id.* at 725. The Court of Appeals correctly noted that "there is no Kentucky law which authorizes the giving of such an instruction." *Id.*

### 3. Misconduct of Dr. Eiseman and His Attorney

■ Appellants argue they are entitled to a new trial because of the "[m]isconduct ... of the prevailing party, or of his attorney." CR 59.01(b). Appellants' claim that after stipulating shortly before the trial that he had deviated from the requisite standard of care in examining Michael's x-ray, Dr. Eiseman testified and his attorney argued that this deviation was inconsequential and that he was "sorry" for the mistake. Appellants argue that Dr. Eiseman and his counsel should not have been permitted to make these and similar statements to the jury since they had admitted his "liability" for Michael's injuries. However, Appellants' argument reveals a fundamental misunderstanding of our tort law in that it assumes Dr. Eiseman's stipulation that he had violated the standard of

4. KRS Chapter 44.

care was equivalent to an admission of his liability for Michael's injuries, the ultimate issue in this case. In light of the foregoing, we have reviewed Dr. Eiseman's testimony and find no evidence of misconduct.

#### 4. Jury Instructions on Comparative Negligence

■ Appellants contend that the trial court erred in submitting an instruction to the jury which permitted a finding of comparative negligence on the part of the Appellants, "Michael Bayless and/or his parents." Appellants' primary argument is that it was error to submit the question of Michael's negligence to the jury because of his relative youth and inexperience given that he was only 14 years old at the time of the accident. In support of their claim, Appellants cite *Baldwin v. Hosley*, 328 S.W.2d 426 (Ky.1959), which discusses the application of the long-overruled principle of contributory negligence [5] in cases where a party is a minor. They also claim that Boyer's allegedly inadequate discharge instructions relieved them of any duty they might have had to seek follow-up medical care.

■ Appellants claim there was no factual basis for a jury instruction on the issue of comparative negligence and such an instruction was therefore impermissible. While it is true that "an instruction must not be submitted on an issue that is entirely unsupported by evidence or reasonable inferences therefrom," *West Virginia Tractor & Equip. Co. v. Cain*, 487 S.W.2d 910, 911 (Ky.1972), Appellants have clearly ignored any and all such evidence in constructing this argument. Instead, Appellants present a litany of reasons that their liability should be excused or minimized. Such an argument, while appropri-

ate for a jury at trial, does not address the fundamental error they have alleged here. There was sufficient evidence in this case to suggest that Appellants bore some responsibility for the injuries they claimed, not the least of which was the 66 day delay between Michael's treatment in the emergency room and his decision to seek follow-up treatment. Therefore the trial court's decision to instruct the jury on the issue of comparative negligence was not error.

#### 5. General Inadequacy of Jury Instructions

■ This ground for appeal is, at best, a makeweight argument. Appellants' brief states that the instructions provided at trial "essentially [gave] the jury no legal direction at all." Appellants cite no specific deficiencies or problems with the jury instructions and instead make only broad assertions of error. They ask that we overrule *Cox v. Cooper*, 510 S.W.2d 530 (Ky.1974), which held that jury instructions "should provide only the *bare bones*, which can be fleshed out by counsel in their closing arguments if they so desire." *Id.* at 535 (emphasis added). *Cox* is not alone, however, and is buttressed by a long line of Kentucky cases which call for a substantially similar approach. *See, e.g., Meyers v. Chapman Printing Co.*, 840 S.W.2d 814 (Ky.1992); *Rogers v. Kasdan*, 612 S.W.2d 133 (Ky.1981); *King v. Grecco*, 111 S.W.3d 877 (Ky.App.2002). The instructions provided to the jury in this case were clearly adequate under Kentucky's established standard. Furthermore, Appellants' failure to cite any specific deficiency or to provide any more than a general objection to the practice of "bare bones" instructions gives us no reason to

---

**5.** The doctrine of pure comparative negligence was adopted in *Hilen v. Hays*, 673

S.W.2d 713 (Ky.1984).

depart from our time-tested method of instructing juries.

### 6. The Jury's Verdict of No Liability for Dr. Boyer

■ Appellants claim that the jury's verdict in favor of Dr. Boyer was not supported by sufficient evidence and that it was error for the trial court to deny their motion for a new trial pursuant to CR 59.01(f). Appellants have identified three independent examples of what they claim was uncontroverted evidence of Dr. Boyer's negligence. These include his alleged failures (1) to perform the "Anatomical Snuff-Box Test" during Michael's emergency room examination, (2) to diagnose Michael's broken wrist through examination of the x-ray, and (3) to provide adequate discharge instructions upon Michael's release.

■ At the outset, we would note that our role as a reviewing court is limited:

> The role of the appellate court when deciding negligence issues of this sort is limited to viewing the evidence from a standpoint most favorable to the prevailing party. In negligence cases such as this one the verdict of the jury resolves any conflicts in the testimony and also any conflicts in the reasonable inferences to be drawn from the testimony in favor of the prevailing party.... In short, an appellate court must not substitute its findings of fact for those of the jury if there is evidence to support them.

*Horton v. Union Light, Heat & Power Co.,* 690 S.W.2d 382, 385 (Ky.1985) (internal citations omitted). As stated above in our discussion of the zero verdict, appellate review of a trial court ruling on a motion brought pursuant to CR 59.01 is subject to the clearly erroneous standard, and requires a great deal of deference to the trial court. *See Turfway Park Racing Ass'n v. Griffin,* 834 S.W.2d 667, 669 (Ky.1992).

Viewing the evidence in this case in the light most favorable to Dr. Boyer, it is clear that there was substantial evidence supporting the jury's verdict in his favor. Appellants first contend that it was uncontroverted that Dr. Boyer did not perform an adequate physical examination of Michael's wrist, namely a palpation known as the "Anatomic Snuff-Box Test." Significantly, Dr. Boyer did not remember the details of his meeting with Michael. However, he did testify that his notes taken during the examination included the comment "no wrist pain," indicating to him that it was likely he performed the test because he would have thoroughly examined each of the bones in the wrist before making such an observation. Further, Michael admitted that Dr. Boyer had palpated different areas of his wrist, each time asking him if he experienced any acute pain.

As for the x-rays, Dr. Boyer testified that because his physical examination revealed no acute pain in Michael's wrist, he did not believe that he would have ordered, much less examined, x-rays of the joint. Although Appellants contend that he did in fact examine the x-rays, such inconclusive testimony does not bar an inference by the jury in favor of the other party. Furthermore, the jury may have concluded that a failure by Dr. Boyer to properly interpret the x-rays was not a substantial factor in causing further injury to Michael due to Dr. Eiseman's subsequent admission that he had misread Michael's x-ray.

Finally, Appellants argue that Dr. Boyer's discharge instructions to Michael were inappropriate. Although there was some disputed evidence regarding the verbal instructions given by Dr. Boyer, the dis-

charge form clearly indicated that Michael should call his physician or return to the emergency room if his condition worsened or returned. Because Michael received such notice, it was reasonable for the jury to conclude that Dr. Boyer's instructions were sufficient.

In the end, Appellants' list of "uncontroverted" evidence, though it musters perhaps the strongest factual arguments from which a jury might infer that Dr. Boyer was liable, is incomplete in that it avoids any mention of evidence in the record that might lead a jury to the opposite conclusion. We, however, cannot ignore the existence of that evidence. Stated simply, Appellants ignored their obligation to show that the jury's verdict was not based on substantial evidence and instead endeavored to prove to this Court that they had the "better" case.

### 7. Juror Misconduct

Finally, Appellants claim it was error to deny their motion for a new trial because CR 59.01(b) permits such relief when there has been "misconduct of the jury." Specifically, Appellants claim that it was misconduct for one juror to vote against liability for Dr. Eiseman because the doctor had stipulated that his failure to recognize the fracture in the x-ray of Michael's wrist fell below the appropriate standard of care and the jury had been instructed as to that fact. Appellants state, "[t]his illogical vote demonstrates a clear bias and prejudice which forecloses the ability to achieve a fair trial when a juror ignores stipulations and a court's directive." Appellants press this claim despite the fact that the jury concluded *in their favor* that Dr. Eiseman was partially liable for Michael's injuries, albeit by a vote of 11–1.

 As noted by the Court of Appeals, Appellants cite no legal authority supporting this claim. They confuse Dr. Eise-

man's stipulation that his treatment fell below the standard of care with an admission that he is liable for Michael's injuries. In so doing, they ignore the possibility that a party might admit to a deviation from the standard of care but still avoid liability for an injury because the jury determines that the deviation was not the cause or proximate cause of the opposing party's injury. The trial court's instruction to the jury on this issue clearly contemplated just such a scenario. It read:

> The Defendant, Walter Eiseman, M.D., has stipulated that he did not meet his duty of care as a radiologist when he read Michael Bayless' x-ray of March 12, 1995. Given Walter Eiseman's failure to comply with this duty, if you believe from the evidence that such failure was a substantial factor in causing Michael Bayless' injuries, you will find for Michael Bayless against Walter Eiseman; otherwise, you will find for Walter Eiseman, M.D.

*Bayless et al. v. St. Elizabeth Medical Center et al.,* No. 96–CI–00438 (Kenton Cir. Ct. filed Jan. 25, 2001) (Jury Instructions, Instruction No. 4). In light of these facts, Appellants' statement in their brief that "[t]he [trial court] so instructed the jury that they should find for plaintiffs on that issue," is clearly inaccurate. Likewise, their claim of juror misconduct is wholly without merit.

## IV. CONCLUSION

Appellants argue that they are entitled to a new trial due to the cumulative effect of errors alleged to have occurred at trial. Having failed to identify any error in the proceedings, we affirm the Court of Appeals.

COOPER, JOHNSTONE, SCOTT and WINTERSHEIMER, JJ., concur.

GRAVES, J., dissents by separate opinion in which LAMBERT, C.J., joins.

GRAVES, Dissenting Justice.

Respectfully, I dissent from the majority's decision to affirm the "zero" verdict for pain and suffering.

Michael Bayless was improperly diagnosed with a sprained wrist. In this diagnosis, his doctor told him that the pain from a sprained wrist could be worse than a broken bone, and could last a long period of time. When a physician examines a patient and gives an expert diagnosis, the patient naturally trusts this diagnosis. The fourteen-year-old Bayless, who by all accounts does not seem to be particularly outspoken, did not have any reason to doubt his doctor. Although the pre-printed words on his discharge paperwork stated that he should contact his physician if his condition "worsened" or "returned," his physician directly told him that the pain would persist for a long period of time. Yet, this minor child and his parents were found to be contributory negligent for their failure to second-guess his treating physician sooner. As a result of the improper diagnosis, Michael had an untreated wrist fracture for a two-month period. He played baseball with a fractured wrist that he believed to be a sprain, icing it down and taking over-the-counter medication to alleviate the pain. However, he was ultimately punished for "playing through the pain."

In affirming the jury's zero verdict for pain and suffering, the majority fails to adequately address several key points which indicate that Michael necessarily experienced more pain and suffering as a result of the improper diagnosis than he would have had his wrist been properly diagnosed as a fracture in the first place.

First, in considering Dr. Wyrick's testimony that there is no significant difference in pain from casting versus surgery associated with treating a fractured wrist, it is important to note that this conclusion only refers to the pain associated with *healing of the wrist itself,* and does not include the pain associated with the surgical procedure. The procedure involved placing Michael under general anesthesia, cutting into Michael's thigh, harvesting a portion of his thighbone, and inserting the bone into his wrist with a permanent metal screw. Michael would not have undergone this surgery if the fracture had been diagnosed in a timely manner. The majority dismisses the pain associated with this procedure because it was "performed under general anesthesia." Anesthesia, of course, wears off, and when it does, there undoubtedly is pain associated when one undergoes such an invasive procedure. There was uncontroverted testimony from Michael that he was fearful of undergoing the operation, the anesthesia made him vomit, his hip felt like somebody had stabbed him and twisted a knife in his bone, and that his wrist felt like someone had "parked a car" on top of it. By the majority's rationale, any pain associated with invasive surgery is negligible so long as the surgery itself is preformed under anesthesia (which is the general practice this day and age).

The majority also ignores the fact that Michael's misdiagnosis resulted in a delay of treatment, which in turn caused Michael to endure pain and suffering for an additional two-month period. Although Michael may not have been vocal about his pain, he had a fractured wrist, and definitely experienced pain as a result of it. He certainly would not have played an entire baseball season and postponed treatment for two months if he had known of the fracture from the onset, regardless of whether or not he knew of the fracture at the end of his season.

Pain and suffering damages are long recognized by our jurisprudence. However, this case illustrates an unfairness that may arise in calculating these damages. By its nature, pain and suffering is a subjective experience. In addition, pain and suffering is an abstract, albeit real, impairment. The award for pain and damages, then, seeks to measure this abstract harm. It requires jurors to assess the inherently subjective pain and suffering of another, and then determine the economic value of this noneconomic harm.

It is difficult for an individual to measure one's own pain, let alone the pain of another. Yet, jurors are required to measure the pain of another with a dollar amount without clear guidance from the court. Instead, guidance comes from the attorneys who have broad latitude to present evidence of pain and suffering, and suggest how these damages should be calculated. *See* Randall R. Bovbjerg et. al., *Valuing Life and Limb in Tort: Scheduling Pain and Suffering*, 83 Nw. U.L. Rev. 908, 913–16 (1989).

As a result, pain and suffering awards are unpredictable and varied. Although jurors should have discretion to weigh the facts of a particular case, empirical evidence reveals significant inconsistencies in pain and suffering awards. *Bovbjerg, supra*, at 917 (analyzing the variance of jury findings on damages in Florida and Kansas City from 1973–1987). As many scholars have noted, this variance and lack of predictability in juror awards runs contrary to the rationality and stability that is a hallmark of the rule of law. *See* Paul V. Niemeyer, *Awards for Pain and Suffering: The Irrational Centerpiece of Our Tort System*, 90 Va. L. Rev. 1401 (2004); Joseph H. King, Jr., *Pain and Suffering, Noneconomic Damages, and the Goals of Tort Law*, 57 Smu L. Rev. 163 (2004).

There is, of course, no way for jurors to "feel the pain" of a plaintiff, and as a result, "evidence" of such pain is reduced to factors such as how much an individual complains of pain, or the kind of physical activities that the individual performs. Plaintiffs like Michael, who quietly endure pain and persist with their activities, are punished as a result. I believe that a form of scheduling for noneconomic damages such as pain and suffering will result in greater predictability and fairness in awards. *See e.g., Bovbjerg, supra.*

Pain and suffering was clearly established in this case, thus, I find the "zero" verdict to be clearly erroneous.

LAMBERT, C.J., joins this dissent.